UNITED STATES of America, Appellee,

v.

Brian BURNS, Defendant–Appellant.

No. 58, Docket 96–1035.

United States Court of Appeals,
Second Circuit.

Argued Aug. 29, 1996.

Decided Jan. 14, 1997.

Mark A. Kaplan, Burlington, VT (Jarvis and Kaplan, Burlington, VT, of counsel), for Defendant–Appellant.

Paul J. Van De Graaf, Assistant U.S. Attorney, District of Vermont, Burlington, VT (Charles R. Tetzlaff, United States Attorney for the District of Vermont, David V. Kirby, Chief, Criminal Division, United States Attorney, District of Vermont, Burlington, VT, of counsel), for Appellee.

Before: MESKILL, KEARSE, and MAHONEY *, Circuit Judges.

MAHONEY, Circuit Judge**:

Defendant-appellant Brian Burns appeals from a January 11, 1996 judgment of the United States District Court for the District of Vermont, McAuliffe, J. (United States District Judge for the District of New Hampshire, sitting by designation), convicting him of wire fraud, in violation of 18 U.S.C. § 1343, concealment of a material fact in a matter within the jurisdiction of a federal agency, in violation of 18 U.S.C. § 1001, and use of a false document in violation of 18 U.S.C. § 1001, and sentencing him to 10 months incarceration, four months of which to be served as electronically-monitored home detention, and imposing $21,186 in restitution. On appeal, Burns argues that the district court (1) erred in rejecting his claim that the verdict should be overturned due to insufficiency of the evidence, (2) improperly refused his request for a new trial based on prosecutorial misconduct, and (3) incorrectly calculated his sentence. We reject these contentions and affirm the judgment.

## BACKGROUND

The following facts are not substantially in dispute. From 1989 to 1993, Brian Burns, a former lieutenant governor of Vermont, served as a program manager for Northeast Rural Water Association (Northeast). Northeast is a non-profit corporation which trains and assists rural communities in Vermont, New Hampshire, and Massachusetts to provide safe drinking water and to deal with waste water.

Much of Northeast's funding comes indirectly from federal grants. Funding for the "program manager" position occupied by Burns, for example, derived from a grant by the Environmental Protection Agency (EPA) to the National Rural Water Association (National), which was an umbrella organization for local rural water associations throughout the country. National, in turn, provided the funds to Northeast and monitored Northeast's use of the funds.

A contract between Northeast and National dated April 13, 1990 and covering a period of May 1, 1990 to April 30, 1992, detailed how the EPA funds were to be used and provided for oversight by National. The contract required Northeast to appoint a program manager and dictated that the program manager work full time and provide a minimum number of technical assistance visits and training hours to local communities. The contract further provided that Northeast would furnish truthful information to National, and would notify National of any circumstance that might impact on Northeast's ability to perform under the contract. National also required Northeast to provide copies of all checks disbursing federal funds and all travel vouchers and required that program managers maintain daily time sheets. Burns was responsible for fulfilling all the duties imposed by Northeast's agreement with National.

In May 1990, Burns was accepted in a full-time Masters of Public Administration program at Harvard University.

In June 1990, although Northeast maintained its office in Williston, Vermont, Burns leased a one-bedroom apartment in Cambridge, Massachusetts on behalf of Northeast. The apartment was furnished as a residence and with office equipment and the lease payments were made with federal funds.

---

* The Honorable J. Daniel Mahoney, who was a member of the panel, died on October 23, 1996. Prior to his death, he participated in the consideration and decision of this case.

** Judge Mahoney was the principal author of the opinion of the court.

In July 1990, while Burns was still receiving his federally funded salary, he began to attend Harvard full time. Harvard required that students in this program devote themselves full time to their studies and that students in the master's program live near the school while pursuing the degree. Burns assured Harvard that he would satisfy these requirements.

While he attended Harvard, Burns submitted program manager time sheets indicating that he worked full time, during regular business hours, for Northeast. Burns directed his sister, Tess Carp, also a Northeast employee, to complete and submit his time sheets during the time he attended Harvard. Ms. Carp transmitted this information to National via computer.

During this time period, Burns also submitted travel vouchers to National and was reimbursed from federal funds for the expenses documented in those vouchers. Burns received reimbursement for numerous trips to and from Massachusetts.

### A. Summary of the Government's Case

At trial, the government's position was that Mr. Burns "crafted a wide-ranging scheme to attend [Harvard] full time, while receiving a salary and expenses funded by a federal grant" despite his not working full-time for Northeast, as required by the contract. The government contended that Burns purposely concealed his attendance at Harvard from both National and Northeast, and misrepresented the "amount and nature of the work he performed on behalf of Northeast" while he attended Harvard.

The government also maintained that Burns leased the Cambridge apartment for his personal use while at Harvard, and not for any legitimate Northeast business. The woman who leased the apartment to Burns testified that he told her that he needed the apartment for the school year only, and asked about a nine-month lease. The government also emphasized that Burns' efforts to secure the apartment began when he was accepted into Harvard.

The government relied heavily on the time sheets which Burns admittedly directed his sister to submit on his behalf, and which indicated that he was working full time during regular business hours for Northeast while he was in fact a full-time student at Harvard. The government also placed substantial reliance on the travel vouchers which were submitted by Burns for reimbursement for numerous trips to and from Massachusetts, but which never mentioned Harvard.

### B. Summary of Burns' Case

In his defense, Burns maintained that he did not deliberately conceal his attendance at Harvard, and had, in fact, obtained permission from members of Northeast's board to pursue the degree. Further, Burns contended that he did fulfill his duties to Northeast while he was in school.

With regard to the apartment, Burns maintained that Northeast officials had discussed opening a Boston office for a number of years, and that the apartment he rented was merely the proper implementation of this plan. Burns further contended that although he did intend to sleep at the apartment while in the Boston area on official business, the apartment was also suited for use as office space, and was necessary for Northeast to arrange training with the State of Massachusetts.

Burns also averred that although the time sheets he directed his sister to submit on his behalf were not accurate, those sheets do not evince any intent to deceive on his part. He testified that the purpose of the time sheets was simply to inform National of vacation time, sick leave and holidays.

### DISCUSSION

### I. Sufficiency of the Evidence

Burns claims that the district court erred in rejecting his motion for a judgment of acquittal on the ground that the government failed to present evidence sufficient to convict him on Counts Two, Three and Four.[1]

1. Burns moved for a judgment of acquittal on Counts Two, Three, and Four during the trial, and by written motion dated July 7, 1995. As discussed more fully below, Count Two alleged a fraudulent scheme in violation of 18 U.S.C.

**534**

Burns bears a heavy burden to succeed on this claim. "We will not disturb a conviction on grounds of legal insufficiency of the evidence at trial if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Chalmers v. Mitchell,* 73 F.3d 1262, 1272 (2d Cir.) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* —— U.S. ——, 117 S.Ct. 106, 136 L.Ed.2d 60 (1996). "We review the evidence in the light most favorable to the government, drawing all inferences and resolving all issues of credibility in its favor." *United States v. Millar,* 79 F.3d 338, 344 (2d Cir.1996) (citation omitted). We apply this exacting criteria, in turn, to each count on which Burns was convicted.

### A. *Count Two*

In Count Two of the indictment, the government charges that Burns violated 18 U.S.C. § 1343, which provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [is guilty of an offense.]

Burns argues that the district court's denial of his motion for a judgment of acquittal on this count was "clear error" because "the evidence was insufficient as a matter of law to establish the existence of a scheme to defraud and that [Burns] knowingly and willfully participated in it." Burns maintains that (1) "the evidence introduced at trial was clear that [Burns] had the authority to open a Boston office without National's prior approval," and (2) "the evidence shows that [Burns] did not attempt to withhold his attendance at Harvard from Northeast or National."

§ 1343, while Counts Three and Four alleged false statements in violation of 18 U.S.C. § 1001.

■ First, whether or not Burns had the authority to open another office for Northeast,[2] is not determinative of whether he engaged in a "scheme to defraud." Even if the jury concluded that Burns had authority to open an office, a reasonable jury could easily conclude that Burns leased the apartment, or the "Boston office," as Burns refers to it, for the very purpose of having Northeast pay part of his living expenses while he attended Harvard, in furtherance of an illegal "scheme to defraud."

■ Second, the government did produce evidence upon which a "rational trier of fact" could conclude that Burns attempted to conceal his attendance at Harvard from National and Northeast. For example, the government introduced time sheets which Burns directed his sister Tess Carp, also a Northeast employee, to fill out on his behalf. The time sheets indicate that Burns was working for Northeast full time, during regular business hours from July 1990 through June 1991. This is the same period of time that Burns was a full-time student at Harvard. The government introduced detailed attendance records kept by one of Burns' professors, showing that Burns was in class when his time sheets indicated he was working for Northeast. With regard to the time sheets, the government focuses in particular on January 1991. Burns' time sheets state that he was working full-time regular hours for Northeast during January, when apparently he was attending an intensive negotiation workshop every weekday in January 1991. In addition to the inaccurate time sheets themselves, the jury was also presented with evidence that a National employee, Mr. Wade, complained to Burns about the manner in which he completed the time sheets. From this the jury could infer that Burns was aware of the importance of accurate time sheets, but nevertheless submitted inaccurate records, implying intent. Although Burns testified that he did not, in fact, attempt to deceive Northeast by filling out the time sheets as he did, the jury was free to disbe-

**2.** The government asserts that Burns did not, in fact, have the authority to open a Boston office for Northeast without the approval of the board of directors of Northeast and National.

lieve him, and infer from the circumstantial evidence that he did so intend.

■ Further, Burns' travel vouchers document frequent travel to and from the Boston office, ostensibly for official business. However, Harvard is not mentioned in the vouchers. The government also introduced evidence that Burns was required to be in Massachusetts for Northeast business only on a few occasions. From this, the jury properly could infer that Burns completed the travel vouchers in furtherance of a fraudulent scheme.

■ Burns also argues that he introduced evidence indicating that he disclosed to several members of the Northeast Board of Directors that he was attending Harvard, and therefore, did not attempt to conceal this fact. Although Burns did introduce evidence that he had mentioned his enrollment at Harvard to other Northeast employees, a reasonable jury could conclude that Burns was purposefully evasive or misleading about his studies at Harvard, in furtherance of a scheme to defraud. For example, Ardyce Cochran, a Northeast board member, testified that although she had spoken to Burns about Harvard, Burns never told her that he was making a full time commitment to Harvard.

### B. Count Three

■ In Count Three, the government charges that Burns violated 18 U.S.C. § 1001, which provides, in pertinent part: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact [is guilty of an offense.]"

Burns argues that the "evidence is insufficient to establish that he intentionally withheld from National his attendance at Harvard." As discussed above in regard to Count Two, the government introduced time sheets Burns submitted indicating that he was working full-time during regular business hours on behalf of Northeast when he was a full time student at Harvard, and travel vouchers Burns submitted charging the government for numerous trips to and from Massachusetts, without any mention of Harvard. From this a reasonable jury could conclude that Burns knowingly and willfully falsified or concealed material facts from a government agency, in violation of 18 U.S.C. § 1001.

### C. Count Four

In Count Four, the government alleges that Burns violated the portion of 18 U.S.C. § 1001 that states: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry [is guilty of an offense.]"

This Count again focuses attention on the time sheets. Burns argues that his testimony, and that of his sister, Tess Carp, establishes that the true purpose of the time sheets was only to inform National of vacation time, sick leave, and holidays, not to document all of his work hours. Again, the jury was free to reject this testimony, and to infer, based on the circumstantial evidence discussed above, that Burns made fraudulent statements, in violation of the portion of 18 U.S.C. § 1001 quoted above. The government presented sufficient evidence for the jury to find guilt.

### II. Sentencing

At Burns' sentencing hearing, the district court determined that the base offense level was 6. See United States Sentencing Guidelines (Guidelines) § 2F1.1(a). The district court increased the base offense level by 2 for "more than minimal planning," as enumerated in Guidelines § 2F1.1(b)(2)(A), and by 4 because the district court determined the amount of the loss to be between $20,000 and $40,000, as indicated by Guidelines § 2F1.1(b)(1)(E).

Burns challenges the district court's determination that the loss was between $20,000 and $40,000. The district court determined that there was a $21,186 dollar loss: $13,463 for the apartment, travel and per diem, mi-

nus a $1,000 credit for legitimate expenses, and a salary loss of $8,723.

In reviewing a sentence imposed under the Guidelines, we "accept the findings of fact of the district court unless they are clearly erroneous." 18 U.S.C. § 3742(e). We "'will not overturn the court's application of the Guidelines to the facts before it unless we conclude that there has been an abuse of discretion.'" *United States v. Hernandez–Santiago,* 92 F.3d 97, 100 (2d Cir.1996) (quoting *United States v. Santiago,* 906 F.2d 867, 871 (2d Cir.1990)); *see also Koon v. United States,* —— U.S. ——, ——, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996) (when sentencing pursuant to the Guidelines "district courts retain much of their traditional sentencing discretion"). We apply this standard to the district court's factual determination of the amount of loss caused by Burns.

### A. *Salary Loss*

■ Burns argues that he "never intended the Government to suffer the loss of his salary and in fact the Government suffered no such loss." Burns maintains that, despite his attendance at Harvard, he nevertheless fulfilled all of his obligations to Northeast to the satisfaction of the Northeast board, and that Northeast, in turn, met all of the requirements of its contract with National. Burns therefore concludes that the district court should have recognized that the amount of "lost salary" was zero.

The district court acknowledged that evaluation of the loss posed a "more complex and difficult problem" than the other sentencing issues. The district court also correctly noted that a plausible argument could be made that the "loss" consists of all the EPA grant money received by Northeast, because the grant money would not have been paid if Burns had fully disclosed his Harvard attendance. Instead of adopting this approach, however, the district court calculated the loss in a manner much more favorable to Burns.

The district court recognized, and the government concedes, that while the evidence established that Burns did not work fulltime for Northeast, he did do some work for Northeast while he attended Harvard. As such, some, but not all of Burns' salary was

"lost." The district court, therefore, calculated the "salary loss" by determining the number of hours Burns devoted to actual participation in the Harvard program and multiplying that figure by a reasonable estimation of his hourly rate. Based on this calculation, the district court arrived at the $8,723 figure for lost salary.

The Guidelines note that in a fraud case, "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." Guidelines § 2F1.1, cmt. n. 8; *United States v. Stanley,* 54 F.3d 103, 106 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 238, 133 L.Ed.2d 166 (1995). The district court reasonably relied on evidence of Burns' salary and the time he spent in class in making its determination. We certainly cannot say that the district court's finding on salary loss was "clearly erroneous."

### B. *Apartment, Travel and Per Diem Loss*

■ The district court concluded that Burns caused an additional loss of $7,514 for mileage and per diem expenses related to travel to Boston, $5,240 in expenses for the apartment, and $709 in parking, for a total of $13,463. In challenging these determinations, Burns essentially reiterates his challenge to the verdict on the grounds of insufficient evidence, arguing that he had authority to open a "Boston office," and that he completed all of his work for Northeast even while attending Harvard. We concluded above that the government presented evidence sufficient for the jury to find that Burns did not work full-time for Northeast while at Harvard and that he improperly leased the apartment for his own personal needs. Burns did not establish that the district court was clearly erroneous in accepting these same conclusions for the purpose of sentencing.

### III. *Prosecutorial Misconduct*

■ Burns asks us to overturn the district court's denial of his motion for new trial on the ground of prosecutorial misconduct. We review a district court's decision on a motion

for a new trial only to determine if the district court abused its discretion. *United States v. Wong,* 78 F.3d 73, 78 (2d Cir.1996); *Blissett v. Coughlin,* 66 F.3d 531, 535 (2d Cir.1995).

■ The district court correctly identified the three-pronged analysis employed by this Court to determine whether the statements or actions of a prosecutor amount to misconduct. That analysis focuses on: the severity of the misconduct, the curative measures taken, and the certainty of conviction absent the misconduct. *United States v. Russo,* 74 F.3d 1383, 1396 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996); *see United States v. Bautista,* 23 F.3d 726, 732–34 (2d Cir.1994). We apply these standards to all of Burns' challenges.

### A. The Prosecutor's Applause Following Defense Counsel's Summation

■ After defense counsel concluded what was apparently a particularly emotional summation,[3] the prosecutor stood up, turned to the jury, and applauded in the direction of defense counsel. The prosecutor obviously applauded not out of admiration for the craftsmanship of a fellow advocate, but as a sarcastic commentary on defense counsel's summation. The district court, Burns, the government, and this Court all agree that the prosecutor's applause was inappropriate.

In considering the severity of the misconduct, the district court thoroughly analyzed this episode in the context of the entire trial. "[A] criminal conviction is not to be lightly overturned ... for the [challenged] statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). The district court concluded that the applause was an isolated incident of misconduct in an otherwise wholly fair trial. The district court correctly noted that Burns' failure to move for a mistrial at any point prior to the verdict supported its belief that the trial was a fair one. *United States v. Melendez,* 57 F.3d 238, 242–43 (2d Cir. 1995) ("Although no federal rule of procedure requires a mistrial motion in order to preserve the issue of prosecutorial misconduct for appeal, the absence of such a motion provides some indication that the improper remark was not perceived as rendering the trial unfair and may indicate that defense counsel preferred to have th[e] jury decide her client's fate.").

■ The district court also considered the effect of curative measures taken at trial, as our case law recognizes that contemporaneous curative measures are the most effective means of neutralizing otherwise prejudicial conduct by a prosecutor. *See United States v. Modica,* 663 F.2d 1173, 1184–85 (2d Cir.1981). Defense counsel objected immediately after the prosecutor's applause. The district court sustained the objection, and addressed the jury as follows: "[The prosecutor's applause was] unprofessional, it's totally inappropriate and you should not consider that [demonstration], ladies and gentlemen, in any way, in your deliberations." The district court concluded that "the curative instructions mitigated any damage that otherwise might have been caused by the improper demonstration." We see no reason to disturb this finding.

Finally, the district court analyzed the likelihood of conviction absent the applause. The district court determined that "[e]ven absent the prosecutor's misconduct, the certainty of conviction on the counts found was substantial." Given the time sheets, travel vouchers, and the circumstantial evidence discussed above, we conclude that, absent the prosecutor's applause, the jury's verdict would have been the same.

### B. Other Challenges

The district court wrote a lengthy opinion regarding Burns' challenge to the prosecutor's applause at the end of defense counsel's summation. It did not, nor was it required to, do so with regard to Burns' other challenges. The district court, however, did

---

3. In its brief, the government asserts that defense counsel cried at the end of his summation. The district court's opinion makes no mention of this, and it is, of course, impossible for us to confirm this by reviewing the trial transcripts.

make clear that it "considered the [other] challenged questions and statements carefully, and in context, [found] that none rose to the level of misconduct, and, in any event, had no adverse effect on the fairness of the trial." We review Burns' other challenges, in turn, below.

### 1. Allegedly Improper Cross-examination of Defense Witness Thomas Salmon

■ Burns claims that he was deprived of a fair trial by the prosecutor's cross-examination of defense witness Thomas Salmon, an attorney who had formerly served as governor of Vermont. Burns called Salmon to the stand as a character witness to testify about Burns' reputation for truthfulness.

On cross-examination, the prosecutor asked Salmon a number of questions concerning his knowledge of a libel case filed by Burns' then-wife, Linda Burns. In that libel action, Linda Burns sought money damages from a newspaper that had published an account of an anonymous accusation—which apparently was never substantiated—that Linda Burns improperly used a state credit card during Burns' tenure as lieutenant governor.

Burns argues that by questioning Salmon about this issue, the prosecutor was attempting improperly to introduce evidence of prior bad acts. Burns argues that these questions were in contravention of Fed.R.Evid. 404(b), as well as the prosecutor's explicit promise, stated on the record before trial, to consult with the judge before attempting to introduce evidence of prior bad acts.

The government responds that it was not attempting to introduce evidence of a prior bad act by Burns. Instead, the government insists that it was exploring the basis of Salmon's testimony about Burns' good character by eliciting whether Salmon was aware that Burns had been involved in this earlier episode. The government submits that Salmon's testimony that he did not recall the details of this incident "gave the jury a basis for considering the weight of [Salmon's] character testimony about Burns." We agree that the prosecutor's questions were not aimed at impeaching Burns with prior bad acts.

Even assuming that they were, however, defense counsel objected to the questioning, and Judge McAuliffe promptly sustained the objection, curing any conceivable prejudice. See United States v. Abrams, 427 F.2d 86, 89 (2d Cir.1970). We concur with the district court's conclusion that the challenged portions of the prosecutor's cross-examination of Salmon do not rise to the level of prosecutorial misconduct.

■ Burns also argues that the prosecutor, by asking Salmon about "allegations made about Mr. Burns concerning the use of a state credit card for his personal business" intentionally misled the jury into believing that Burns, and not Linda Burns, was the subject of the controversy. While the prosecutor's question was not framed as precisely as it might have been, it cannot be disputed that, whatever the merits of the allegation, it did involve Burns, in whose name the state credit card was issued, and who was ultimately responsible for its use. The prosecutor did not mislead the jury in this regard.

### 2. The Prosecutor's Mention of Burns' Attendance at Trinity College in Summation

Prior to attending Harvard, Burns took courses at Trinity College in Burlington, Vermont. The original indictment against Burns charged him with improperly obtaining funding for that course work. Specifically, Count One alleged that Burns had fraudulently obtained over $5,000 from Northeast, an organization that received federal funds, in violation of 18 U.S.C. § 666.

At the conclusion of the government's case, the district court entered a judgment of acquittal as to Count One, holding there was no federal jurisdiction. As the government put it, "[t]his decision by the district court meant that Burns' alleged fraud with respect to tuition money paid by Northeast from non-federal funds was not part of the case that went to the jury."

Burns contends that the prosecutor committed misconduct when, during his summation, he discussed Burns' attendance at Trinity, and, Burns maintains, "[b]y indirect and

subtle implication he reminded the jury that the Defendant had probably obtained his Trinity tuition by fraud, deception or theft."

■ Burns and the government agree that prior to summations, there was a discussion in the judge's chambers regarding the scope of the charges after Count One had been dismissed, and specifically, about how the Northeast board's knowledge of Burns' attendance at Trinity was relevant to the remaining counts, if at all. The government insists that the district judge ruled that the Northeast board's knowledge of Burns' attendance at Trinity was relevant to the scheme to defraud charged in Count Two. Burns maintains that the court ruled that the issue of Trinity tuition was "specifically excluded." Because the exchange between the judge and counsel on this issue took place off the record, it is impossible for us to determine what the district court ruled.

When a district court makes a ruling off the record, Fed. R.App. P. 10(c) provides an appellant with an avenue to get the ruling before an appellate court. The rule states, in pertinent part:

> If no report of the ... proceedings at a hearing ... was made ... the appellant may prepare a statement of the ... proceedings from the best available means, including the appellant's recollection. The statement shall be served on the appellee, who may serve objections or proposed amendments thereto within 10 days after service. Thereupon the statement and any objections or proposed amendments shall be submitted to the district court for settlement and approval and as settled and approved shall be included by the clerk of the district court in the record on appeal.

Fed. R.App. P. 10(c). Because Burns has failed to comply with this procedure, we cannot rule in his favor. · See *King v. Unocal Corp.*, 58 F.3d 586, 587–88 (10th Cir.1995) (court will not consider matters not in the record); *Murphy v. St. Paul Fire and Marine Ins. Co.*, 314 F.2d 30, 31–32 (5th Cir. 1963) (court would not consider district court's ruling when party failed to comply

with a rule which was very similar to Fed. R.App. P. 10(c)).

■ Further, even assuming that the district court ruled as Burns claims it did, a review of the prosecutor's reference to Trinity during summation reveals the reference to be innocuous. The prosecutor stated that "it's only when he decides to go to Trinity full time that he decides that he's not going to touch those time sheets anymore [but instead have his sister fill them out.]" While the jury conceivably could infer from this statement that Burns had committed fraud with regard to Trinity, it is far from a necessary conclusion. Therefore, we conclude that even if the district court ruled as Burns claims it did, Burns was not prejudiced by the prosecutor's statements.

### 3. The Prosecutor's Statement That He Is "Not Permitted to Try [Burns] for Everything He's Done"

■ Burns argues that the prosecutor, in his rebuttal summation, "improperly insinuated" that he was not allowed to attack Burns' character, and then "went on to imply that had he been permitted to do so, there would be plenty of evidence to make such a showing." Burns seems to assert that, because he introduced evidence of his good character, the prosecutor was free to introduce evidence impugning his character, but had no such evidence, and so instead, misled the jury into believing that he did.

During his closing statement, Burns' counsel emphasized evidence tending to show that Burns was a person of good character, and, in particular that he had performed valuable public service on behalf of the people of Vermont.[4] It was in response to these comments that the prosecutor made the following statement that Burns now challenges:

> Ladies and gentlemen, you took an oath to decide the case on the evidence. Mr. Burns—[defense counsel] Mr. Rubin is trying to tell you that the defendant is such a good man that you shouldn't convict him. And, ladies and gentlemen, this is not a referendum on a man. Because in spite of what Mr. Rubin suggests to you, I'm not

---

4. For example, Burns' counsel suggested that the jury review letters of recommendation from several public officials submitted in support of his application to Harvard.

permitted to try the man for everything he's done. This case isn't about what Mr. Burns did before 1990. It isn't about [legislation Mr. Burns worked on when he was in government service]. This case isn't about what Mr. Burns did before 1990.

It is clear that, in context, the prosecutor's statements were not misconduct. If anything, these comments served to reenforce for the jury the proper notion that they were to decide only whether Burns had violated the statute, and not sit in judgment of Burns' character.

## CONCLUSION

We affirm the judgment of conviction.

