IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 27, 2008

Charles R. Fulbruge III
Clerk

No. 07-20461

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

CHARLES CRAWLEY, also known as Chuck Crawley

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and BARKSDALE and STEWART, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Convicted of several crimes relating to voter fraud in connection with his being elected president of Teamsters Local Union 988 (Local 988), Charles Crawley appeals his conviction and sentence. For the former, Crawley challenges an evidentiary ruling. The latter is primarily at issue: specifically, Crawley's salary and pension being used to determine both the loss for computing the advisory Guideline sentencing range and restitution. AFFIRMED.

I.

Local 988, the Houston, Texas, subordinate local labor union of the International Brotherhood of Teamsters, is a "labor organization", within the meaning of the Labor Management Reporting and Disclosure Act (LMRDA), 28 U.S.C. § 402(i), (j). The LMRDA requires such organizations to hold officer elections every three years. Crawley was elected president of Local 988 in 1997 and was reelected in 1999 and 2002.

After irregularities were detected for the 2002 election, an investigation was initiated; it was determined that Crawley had falsified voter ballots. Further investigation revealed he had received a $20,000 kickback during his presidency in connection with a Union contract. Crawley was charged with: (1) one count of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 2; (2) one count of embezzlement of an official ballot for the 2002 election, in violation of 29 U.S.C. § 501(c); (3) one count of embezzlement from a labor organization for the kickback, also in violation of 29 U.S.C. § 501(c); and (4) one count of making a false entry in records required by the LMRDA, in violation of 29 U.S.C. § 439(c).

At trial, the Government proved Crawley's involvement in voter fraud for the 2002 election through the testimony of, among others, Gary Kyle, a truck driver and member of Local 988, who was a friend and supporter of Crawley's. In September 2002, Crawley invited Kyle to his home after work hours. There, the two men engaged in an "assembly-line" process: using several different pens, Crawley marked and folded each ballot; he then handed it to Kyle, who placed and sealed the ballot in the return envelope. Crawley used the Union's membership roster to decide which members were unlikely to vote in the election, such as part-time UPS employees. Kyle testified that peel-and-stick labels generated by the Union's computer were used on the envelopes to avoid their being challenged. Thereafter, the completed ballots were separated by the zip codes for the "voters" and mailed from various post offices.

Crawley's plan went awry, however, when 39 sets of duplicate ballots were received. None of the voters had requested duplicate ballots. This irregularity caused the investigation which ultimately implicated Crawley and Kyle.

A Government witness, Charles King, testified, over Crawley's objection, that, for the 1999 election, which Crawley "won", Crawley: committed similar acts of voter fraud; and devised the strategy of duplicating ballots for those members least likely to vote. After this testimony, the district court gave a limiting instruction to the jury, consistent with Federal Rule of Evidence 404(b): the evidence of the 1999 voter fraud could be considered only for determining Crawley's "motive, intent, identity, knowledge, opportunity, plan, preparation, and the absence of mistake or accident in engaging in" the 2002 voter fraud.

Concerning the kickback, it was proved at trial that—in an incident completely separate from the voter fraud—Crawley requested, and received, an artificially high bid for the purchase and installation of a new telephone system for Local 988's new union hall. David Fagan testified: Crawley promised to award the contract to Fagan, the husband of Crawley's secretary, if Fagan "could bump up the bid 20 grand so that [Crawley] could, you know, get the money". When Fagan explained to Crawley that he would not be the low bidder if he increased the bid, Crawley responded: "I run this hall". He also stated: "I take care of your wife. I pay your insurance. I take care of you all". The latter comment was understood by Fagan to mean his wife would lose her job if he did not agree to the kickback. Fagan increased his bid to $52,364, and Crawley awarded him the contract two days later.

A jury convicted Crawley on all four counts. He was sentenced, inter alia, to 78 months' imprisonment and ordered to pay $121,478.86 in restitution.

II.

In his brief here, Crawley maintained the jury instructions regarding honest-services fraud created a risk of his being convicted for violating civil regulations and internal union policies, as opposed to the mail-fraud statute. That issue was resolved at oral argument, however, by Crawley's conceding this claim failed under the invited-error doctrine, as raised in the Government's brief. See United States v. Baytank (Houston), Inc., 934 F.2d 599, 606-07 (5th Cir. 1991). Obviously, had this concession been made in Crawley's reply brief, which did not even address the Government's invited-error contention, valuable time and resources could have been spared in considering this issue. It goes without saying that, generally, litigants should make concessions in their briefs, rather than waiting to do so at oral argument.

Therefore, two issues remain. First, Crawley maintains it was reversible error to admit evidence of his 1999 voter fraud. Second, he challenges his sentence, maintaining the district court impermissibly utilized his salary and pension as a measure both for calculating "dollar loss" under the advisory Guidelines and for the restitution order.

A.

Crawley maintains the district court violated Rule 404(b) by permitting the Government to present proof regarding his participation in the 1999 voter fraud. Evidentiary rulings are reviewed for an abuse of discretion, subject to a harmless-error analysis. E.g., United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); see FED. R. EVID. 103. Reversible error occurs only when the admission of evidence substantially affects the rights of a party. Morgan, 505 F.3d at 339; FED. R. EVID. 103(a).

Article IV of the Federal Rules of Evidence addresses "RELEVANCY AND ITS LIMITS". "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by [the Federal Rules of Evidence], or by other rules prescribed by the Supreme Court pursuant

to statutory authority." FED. R. EVID. 402. Rule 404(b) limits Rule 402; the former makes "[e]vidence of other crimes, wrongs, or acts [inadmissible] to prove the character of the person in order to show action in conformity therewith". FED. R. EVID. 404(b). The Rule states, however, that such evidence

> may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Id. The purpose of Rule 404(b) is to "guard against the inherent danger that the admission of 'other acts' evidence might lead a jury to convict a defendant not of the charged offense, but instead of an extrinsic offense". United States v. Sumlin, 489 F.3d 683, 689 (5th Cir. 2007). Where the extrinsic activity did not result in a conviction, this danger is particularly great. Id.

As a threshold matter, Rule 404(b) is only implicated when the offered evidence is extrinsic; evidence intrinsic to the charged offense does not implicate the rule. E.g., United States v. Powers, 168 F.3d 741, 749 (5th Cir. 1999). "Other acts" evidence is intrinsic when it is inextricably intertwined with the charged offense, when both acts are part of the same criminal episode, or when the "other act" was a necessary preliminary step toward the completion of the charged crime. Sumlin, 489 F.3d at 689.

There is no dispute that the evidence at issue is extrinsic. The district court found likewise, but ruled it admissible on the ground that it was relevant and probative of Crawley's intent and motive for the charged offenses relating to the 2002 voter fraud. (It is undisputed that, pursuant to Rule 404(b), the Government provided Crawley with the requisite notice of its intent to offer the extrinsic evidence.)

Therefore, in reviewing the admission of the extrinsic evidence, we must employ the well-established, two-pronged analysis for determining whether Rule 404(b) was violated. Morgan, 505 F.3d at 339; see also United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978). First, we determine whether "extrinsic evidence is relevant to an issue other than the defendant's character, i.e., motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident". United States v. Sanders, 343 F.3d 511, 518 (5th Cir. 2003). Second, if the evidence is relevant for at least one of those permissible purposes, we then determine whether, consistent with Rule 403, the evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice". Morgan, 505 F.3d at 339.

For the first prong, Crawley contends that, for the admitted evidence of the 1999 voter fraud, the district court erred in ruling it was probative of Crawley's intent and motive in 2002. He asserts that, because his defense was not that he lacked the motive or intent to commit the voter fraud—but rather that someone else had done so—the testimony regarding the 1999 fraud constituted inadmissible character evidence.

Whether evidence of an extrinsic offense is relevant to the issue of intent—as opposed to being inadmissible character evidence—is determined by comparing the defendant's state of mind in perpetrating the respective offenses. United States v. Gordon, 780 F.2d 1165, 1173-74 (5th Cir. 1986) ("A finding that the offenses involved the same state of mind renders the extrinsic offense relevant to an issue other than character because it lessens the likelihood that the defendant acted with lawful intent in connection with the charged offense."). Moreover, there is no requirement that the prior bad act resulted in formal charges. United States v. Gonzalez-Lira, 936 F.2d 184, 189 (5th Cir. 1991). The Government need only provide "some evidence that the defendant committed the prior bad act". Id. at 189-90 (emphasis in original). Here, the Government

introduced considerable evidence, through King's testimony, that Crawley committed voter fraud in 1999 that was materially identical to that in 2002. Stated differently, it was shown that he acted with the same specific intent in 2002 as he had in 1999.

Regardless of the defenses asserted by Crawley, the Government was required to prove specific intent as an essential element of the charged offenses. Therefore, the extrinsic evidence was offered to demonstrate Crawley acted with the requisite intent to commit those offenses. Based on the testimony regarding the 1999 fraud, the jury could rationally conclude that, "because the defendant had unlawful intent in the extrinsic offense [1999 fraud], it is less likely that he had lawful intent in the present offense [2002 fraud]". Gordon, 780 F.2d at 1173. The testimony, therefore, was offered for a legitimate purpose under Rule 404(b). (Because the evidence was properly offered to show intent, we need not decide whether, in addition, it was admissible to demonstrate motive, as was also held by the district court.)

Having ruled that the extrinsic evidence was properly offered for a permissible purpose under Rule 404(b), we proceed to the second prong of our inquiry: whether, consistent with Rule 403, that evidence "possess[es] probative value that is not substantially outweighed by its undue prejudice". Morgan, 505 F.3d at 339. Crawley asserts only that the evidence of his involvement in the 1999 voter fraud is impermissible character evidence. Tellingly, he makes no attempt to demonstrate that the extrinsic evidence, even if offered for a permissible purpose, was erroneously admitted because the probative value of such evidence was substantially outweighed by the danger of unfair prejudice.

In any event, the district court gave the earlier-described, detailed limiting instruction that the 1999 voter-fraud evidence could only be considered for the limited purpose of determining motive, intent, identity, knowledge, opportunity, plan, preparation, and the absence of mistake or accident in engaging in the

2002 voter fraud. Even assuming, therefore, that admission of the extrinsic evidence posed a risk of undue prejudice, that risk was greatly minimized by the court's limiting instruction. See United States v. Nguyen, 504 F.3d 561, 574-75 (5th Cir. 2007), cert. denied 128 S. Ct. 1324 (2008); United States v. Saucedo-Munoz, 307 F.3d 344, 350 (5th Cir. 2002).

Accordingly, the district court did not err in admitting the evidence of Crawley's 1999 voter fraud. Therefore, a harmless-error analysis is not required.

B.

For his final, and primary, issues, Crawley challenges his sentence on two bases. He maintains it was error for the district court to utilize his pension and salary both as a measure of "dollar loss" for its increasing his offense level and as a basis for restitution.

1.

The presentence investigation report (PSR) determined Crawley's base offense level to be six under advisory Sentencing Guideline § 2B1.1 (economic offenses involving, inter alia, fraud and deceit). It further determined intended loss to be $1,091,244.19 (his salary and pension for 2000-2005, together with the $20,000 kickback), which, under § 2B1.1(b)(1)(I), increased the base offense 16 levels. With a two-level role-adjustment increase under Guideline § 3B1.1(c) (organizer, leader, manager, or supervisor in criminal activity), and a two-level increase under § 3B1.3 for abusing a position of trust which significantly facilitated the commission of the offense, the PSR increased Crawley's total offense level to 26. Crawley objected in district court to the § 2B1.1 dollar-loss calculation, maintaining it should only be $20,000 (the kickback). The district court overruled Crawley's objection, and adopted the PSR. On appeal, Crawley contests the loss calculation on the same basis.

Although post-Booker, the Guidelines are advisory only, and an ultimate sentence is reviewed for reasonableness under an abuse-of-discretion standard,

the district court must still properly calculate the guideline-sentencing range for its use in deciding on the sentence to impose. Gall v. United States, 128 S. Ct. 586, 596 (2007). In that respect, its application of the guidelines is reviewed de novo; its factual findings—including determining the loss amount—are reviewed only for clear error. E.g., United States v. Beydoun, 469 F.3d 102, 107 (5th Cir. 2006) (determining loss calculation not clearly erroneous). A finding of fact is not clearly erroneous so long as it is plausible in the light of the entire record. Id. at 105.

Guideline § 2B1.1(a) establishes a base offense level for those convicted of crimes involving, inter alia, fraud and deceit. Subpart (b) provides increases in that offense level based upon the amount of loss. This increase is significant because, if, as Crawley maintains, the loss was $20,000, there would be only a four-level increase under subpart (b)(1)(C), as opposed to the imposed 16-level increase under subpart (b)(1)(I).

The commentary to § 2B1.1 provides guidance for determining the loss amount. It defines loss as the "greater of actual loss or intended loss". U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense". Id. at n.3(A)(i). "Intended loss" is "the pecuniary harm that was intended to result from that offense". Id. at n.3(A)(ii). Regarding a court's determining the loss amount, the commentary states:

> The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference.

Id. at n.3(C) (emphasis added).

In adopting the PSR, the district court found intended, rather than actual, loss to be in excess of $1,000,000, thereby qualifying for the 16-level increase. The PSR, as well as the briefs here, sometimes refer to the amounts of pension

and salary received by Crawley as actual loss and those not-yet-received amounts as intended loss. These characterizations erroneously imply the district court added both the actual and intended losses to determine the loss amount. As stated, under § 2B1.1, the district court may use only the greater of actual or intended loss. In any event, this incorrect terminology is of no moment because both the money actually received and that which had not yet been received by Crawley could qualify as intended loss—"pecuniary harm that was intended to result from" Crawley's voter fraud. Moreover, PSR ¶ 57 stated: "The defendant is held accountable for an intended loss amount of $1,091,244.1[9]" (emphasis added).

Therefore, at issue is whether it was clearly erroneous for the district court to use Crawley's entire salary and pension in seeking to make a "reasonable estimate" of intended loss for the voter fraud. In disputing the intended-loss calculation, Crawley contends the intended loss was zero because he intended only to deprive Local 988 of the right to elect their officials in an election free of voter fraud, not to deprive them of the salary and pension he would receive. This contention, however, is inconsistent with the offenses with which Crawley was charged. The jury was instructed it was required to find, beyond a reasonable doubt, that Crawley acted with the specific intent to defraud. As to that specific intent, the indictment was read to the jury; it stated Crawley "intended to obtain Local 988 property consisting of a designated salary for the president of Local 988 and associated benefits for the period of January, 2003, until January, 2006". The indictment stated also that Crawley "intended to deprive Local 988 and its members of their intangible right to [Crawley's] honest services".

Although we cannot know which of these theories (if not both) was the basis for Crawley's conviction, each provides a sufficient basis for the district court's determining the intended loss constituted Crawley's salary and pension

for a several-year period (the period used is not contested). Again, "intended loss" is defined as "the pecuniary harm that was intended to result from that offense". U.S.S.G. § 2B1.1 cmt. n.3(A)(ii). "Pecuniary harm" is "harm that is monetary or that otherwise is readily measurable in money". Id. at n.3(A)(iii).

Obviously, if the jury found Crawley acted with the intent to deprive Local 988 of salary and benefits, the definition of intended loss would be satisfied. Moreover, even if the jury found only that Crawley intended to deprive Local 988 of honest services, such a finding would still provide a basis for the court's intended-loss finding. By intentionally depriving Local 988 of honest services, Crawley obviously inflicted some level of pecuniary harm on the organization. Along this line, Crawley never maintained at sentencing that he was convicted only of honest-services fraud, rather than pecuniary fraud. It was not clearly erroneous, therefore, for the district court to estimate such loss by looking to Crawley's salary and pension. See United States v. Woodard, 459 F.3d 1078, 1087 (11th Cir. 2006) (holding, under 2B1.1, that "the correct loss amount should be based on . . . the deprivation of [defendant's] honest services. Every dollar [defendant's business] took from the City resulted from depriving the City of [defendant's] honest services").

Relying on United States v. Burns, 104 F.3d 529 (2d Cir. 1997), Crawley contends that any dollar loss for the period utilized must be reduced by the amount of services he legitimately rendered. In Burns, the director of a non-profit organization receiving federal funds pledged to work full time in one state, while he was secretly splitting his time by attending school in another. Id. at 532-33. In determining loss, the district court calculated what percentage of the defendant's time was lost due to his school attendance, then multiplied that figure by his hourly rate. Id. at 536. Crawley advocates our applying the same analysis, which he maintains would lead to no dollar loss, given he was a full-

time employee who, Crawley claims, earned his salary. (Crawley, of course, was far more than an employee; he was president of Local 988.)

The court in Burns, however, acknowledged that the district court could have plausibly regarded all of defendant's salary as a loss to the federal government. Id. Noting that "the loss need not be determined with precision", the Second Circuit held only that it could not "say that the district court's finding on salary loss was clearly erroneous". Id. The same holds true here. At sentencing, after entertaining Crawley's assertion, based on Burns, that his entire salary and benefits could not be used to calculate loss, the district court stated:

> I just think [Burns is] a different situation. [Crawley] did not give them honest service. He couldn't give them honest service because he got it dishonestly. I don't know how you could possibly apportion what part of it he really earned and what part he didn't earn. And I think the point about the fact that he was–not only did he get in there fraudulently, but he also was, you know, getting money fraudulently while he was in there.

(Emphasis added.) In short, the court logically determined that this was not a case, as Burns had been, where legitimate services could readily be separated. Faced with this situation, the court made the reasonable conclusion that it was appropriate to include Crawley's entire salary and pension in its loss calculation, given that his position as president had been procured by fraud.

Although not cited in either party's brief, our court held in United States v. Sublett, 124 F.3d 693 (5th Cir. 1997): where the defendant perpetrates the fraud to procure a contract but intends to provide the contracted-for services, the district court must deduct the value of the legitimate services actually provided. Id. at 695. Obviously, the commission of fraud to procure a union presidency is fundamentally different in many respects, including method of apportionment

of legitimate services, from the commission of fraud to procure a services contract.

In the former situation, the LMRDA imposes an obligation on all union officers to "serve their union members honestly and in good faith". 28 U.S.C. § 501(a). By procuring a union office by fraud, that precept has been violated, which renders any service valueless ab initio. Moreover, as noted by the district court, legitimate services, if any, were not capable of being severed from non-legitimate services, unlike in Burns and Sublett. Accordingly, the district court's finding that intended loss equals Crawley's salary and pension was not clearly erroneous. Restated, that finding is plausible in the light of the entire record.

2.

Crawley's challenge to the restitution award similarly fails. A restitution award is reviewed for an abuse of discretion. See, e.g., United States v. Hughey, 147 F.3d 423, 436 (5th Cir. 1998). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." United States v. Yanez Sosa, 513 F.3d 194, 200 (5th Cir. 2008) (quoting United States v. Ragsdale, 426 F.3d 765, 774 (5th Cir. 2005)) (internal quotation marks omitted).

Crawley contests the restitution of $121,478.86 (salary and pension from 2003 and the $20,000 kickback) because he claims that amount was not actually lost by Local 988. Under the Mandatory Victim Restoration Act (MVRA), 18 U.S.C. § 3663A, "[a] defendant . . . is only responsible for paying restitution for the conduct underlying the offense for which he was convicted". United States v. Wright, 496 F.3d 371, 381-82 (5th Cir. 2007) (quoting United States v. Inman, 411 F.3d 591, 595 (5th Cir. 2005)) (internal quotation marks omitted) (emphasis added). When, as here, a fraudulent scheme is an element of the conviction, the court may award restitution for "actions pursuant to that scheme", with the

restitution for the underlying scheme to defraud being limited to the specific temporal scope of the indictment. Id.

Upon the PSR's recommending restitution of $121,478.86, Crawley objected, claiming it should be limited to the $20,000 kickback. As with intended loss, the district court overruled Crawley's objection and adopted the PSR.

As with the loss amount, Crawley concedes any restitution should include the $20,000 kickback. In challenging the balance, Crawley asserts Local 988 suffered no actual loss because, in essence, the Union would have paid an honest union president the same amount. In support, he cites United States v. Sapoznik, 161 F.3d 1117, 1121-22 (7th Cir. 1998) (measuring restitution by "the difference in the value of the services [defendant] rendered [the victim] and the value of the services that an honest police chief would have rendered"), and United States v. Guthrie, 64 F.3d 1510 (10th Cir. 1995) (noting proper measure of restitution is the amount of loss to victim, not the amount received by the defendant). Therefore, Crawley maintains: restitution in the amount of his 2003 salary and pension (i.e., that salary and pension awarded after his 2002 fraud) will provide a windfall to the Union.

We disagree with this analysis. First, for such fact-intensive situations, the Seventh and Tenth Circuits' decisions are more than just distinguishable; they are not at odds with the restitution here.

Sapoznik involved a police chief's receiving a monthly payment/bribe from organized crime for his protecting illegal gambling. Restitution was ordered in the amount of one year's salary for the four served as police chief. There was no mention, however, of defendant's obtaining his position through illegal activity, unlike the case here. Moreover, the opinion noted that a "rough approximation . . . is all that is feasible in the computation of loss in a case such as this". Sapoznik, 161 F.3d at 1122.

14

The Tenth Circuit decision concerned defendant's paying a $10,000 kickback in order to obtain a $24,000 contract from a person holding a government contract. The ordered restitution exceeded the kickback. Guthrie held defendant was "entitled to have the amount of restitution offset by the value of the services he performed under the government contract, if any". Guthrie, 64 F.3d at 1516. For the contract in Guthrie, it apparently would have been possible to ascertain, to the degree necessary, the value of such services performed under the relatively small ($24,000) contract. That is not possible here. In addition, although the defendant in Guthrie obtained the contract by paying a kickback, this is simply not the same, for restitution purposes, as Crawley's engaging in voter fraud to ensure election to a union office. For the latter, the loss of property under the MVRA has far greater bounds.

Second, Crawley's analysis conflicts with the plain language of the MVRA. It states, in relevant part:

> (b) The order of restitution shall require that such defendant–
> (1) in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense--
> (A) return the property to the owner of the property or someone designated by the owner; or . . . .

18 U.S.C. § 3663A(b)(1)(A) (emphasis added). In other words, the MVRA requires the defendant to return any ill-gotten property which has been acquired by, inter alia, fraud on the victim. The salary and pension received by Crawley after/in connection with his 2002 voter fraud certainly meets this requirement. Crawley procured the salary and pension through his fraudulent acts, bringing his conduct within the above-quoted statutory language. Therefore, returning the salary and pension is required.

A contrary holding would allow Crawley to benefit from his fraudulent conduct, a result which runs afoul of the principles on which restitution is based. Restitution "is separate and distinct from any punishment visited upon the

wrongdoer and operates to ensure that a wrongdoer does not procure any benefit through his conduct at others' expense". United States v. Newman, 144 F.3d 531, 538 (7th Cir. 1998) (citing 1 GEORGE E. PALMER, THE LAW OF RESTITUTION § 1.1, at 5 (1978)). The district court, therefore, did not abuse its discretion in ordering the challenged restitution under the MVRA.

III.

For the foregoing reasons, the judgment is AFFIRMED.