**UNITED STATES of America,**
**Appellee,**

v.

**Sheldon WALKER and Mohammed Rasheed Khan, also known as Rashid Uddin Khan, Defendants–Appellants,**

**Shaikh Saeed, Defendant.**

**Docket Nos. 98–1552(L), 98–1564.**

United States Court of Appeals,
Second Circuit.

Argued April 6, 1999.

Decided Sept. 7, 1999.

**330**

Roger Bennet Adler, New York, N.Y., for Defendant–Appellant Walker.

Maranda E. Fritz, Fritz & Miller, New York, N.Y., for Defendant–Appellant Khan.

Richard Sullivan, Assistant United States Attorney (Mary Jo White, United States Attorney for the Southern District of New York; Christine H. Chung and George S. Canellos, Assistant United States Attorneys, of counsel), New York, N.Y., for Appellee.

Before: NEWMAN, WALKER, and SOTOMAYOR, Circuit Judges.

WALKER, Circuit Judge:

Defendants-appellants Sheldon Walker, an immigration attorney, and Mohammed Rasheed Khan, an interpreter in Walker's office, were convicted after a jury trial on counts of conspiracy, mail fraud, and mak- ing false statements to the Immigration and Naturalization Service ("INS"). The charges arose from an extensive pattern of fraudulent asylum applications submitted to the INS. Walker and Khan appeal from the October 2, 1998 judgments of convic- tion entered in the United States District Court for the Southern District of New York (Harold Baer, Jr., *District Judge*).

Walker and Khan challenge the suffi- ciency of the evidence supporting their convictions, the government's conduct dur- ing its summation, a jury instruction, and various evidentiary and sentencing rulings of the district court. For the reasons that follow, we reverse one of Khan's false statement convictions for insufficient evi- dence, affirm the balance of both defen- dants' convictions, and remand the case for resentencing of Khan.

## BACKGROUND

Walker operated a small law office at Penn Plaza in New York City that special- ized in immigration work. Walker's prac- tice attracted a large number of alien clients, many of whom spoke little or no English, who came seeking assistance in procuring work permits or asylum in the United States. Walker used interpreters in many languages to service his clients. The interpreters met with prospective clients and assisted them in presenting their stories on applications to the INS. Khan, an attorney in Bangladesh before coming to the United States, began work as an interpreter for Walker in 1992.

After examining and comparing the nu- merous applications it received from Walk- er's practice, the INS discovered that many were substantially identical. On September 11, 1996, the government filed an indictment charging Walker, Khan, and Shaikh Saeed (another of Walker's em- ployees) with mail fraud, false statements, and conspiracy. In early 1997, Saeed pled guilty to one count of conspiracy to make false statements and to commit mail fraud.

On October 8, 1997, the government filed a twenty-eight count superseding indictment. The indictment charged Walker and Khan in count one with conspiracy to submit false statements to the INS and to commit mail fraud, in violation of 18 U.S.C. § 371; charged Walker with thirteen counts of false statements in violation of 18 U.S.C. §§ 1001 and 2, and fourteen substantive mail fraud counts in violation of 18 U.S.C. §§ 1341 and 2; and charged Khan in three false application and three mail fraud counts. Walker and Khan were tried jointly before a jury in May, 1998.

The government's case consisted of testimony from INS officials, former employees in Walker's office, and Walker's former clients, as well as a large amount of documentary evidence. Catrin Lea, an INS official, testified about asylum procedures and policies, explaining how applicants for asylum in the early 1990s were routinely given work authorizations that allowed them to work temporarily in the United States while their applications were under review. Special Agent Craig Vanderhoff of the INS described the initiation of the INS investigation into Walker's office. David Cartier, an INS "intelligence research specialist" who regularly reviewed applications for patterns of abuse, testified that in August of 1995, after examining 1365 applications submitted by Walker's office, he found that the applications from immigrants from different countries fell into regular patterns. For example, on Bangladeshi applications, a series of nineteen stories were repeatedly employed almost word-for-word, with certain phrases appearing in identical fashion.

Seven of Walker's former clients testified, many pursuant to cooperation agreements. They recounted that when they engaged Walker's services, Walker or his employees took their photograph and fingerprints, asked them to sign blank immigration forms, and collected a fee, and that they later learned that Walker's office had submitted false asylum applications on their behalf.

For example, Vindhya Vilasini, a native of India, testified that in early 1993 she asked Walker for assistance in her effort to remain in the United States to work. Walker told her he could help her obtain some kind of visa. She then gave her name, date of birth, and country of origin to Khan, who took her photograph and fingerprints. Vilasini returned to Walker's office to pay her fee, and Khan gave her a blank application to sign. The application was later completed with fabricated information that she had not provided. When she asked Khan about the false story on the application, Khan reassured her that it was necessary for an asylum application. At her INS interview, Vilasini lied in conformity with the false story on her application.

Other former clients provided similar accounts. Erdem Akcali, who left Turkey for the United States in 1989, testified that he went to Walker's office in 1992 and told Walker he was seeking political asylum. Akcali provided one of Walker's employees with a statement about the oppression he had experienced in Turkey due to his political beliefs. In 1995, when he was due to report to the INS for an interview, Akcali reviewed his application and discovered that it contained a completely different story from the one he had provided. When he confronted Walker with this discrepancy, Walker told Akcali that he had to stand by his application as it was written, or he would have to withdraw the application. When Akcali refused to support the application and resisted signing a withdrawal letter, Walker threatened to call the police and arrange for his deportation. Akcali then signed the withdrawal letter and pursued his asylum claim through another attorney.

Floria Perlleshi, a Yugoslavian national, testified that after working illegally for a short time in the United States she and her husband sought Walker's assistance in procuring green cards. Walker advised them to pursue asylum and she and her husband told him of the difficulties they

had experienced as Albanians in Yugoslavia. Walker collected a fee and instructed them to sign some blank forms. Several months later, after hearing nothing, they returned to Walker's office, where they signed more papers and paid an additional fee. They then received work authorizations in the mail and renewed them annually, each time paying Walker additional fees. Tired of waiting, Perlleshi eventually requested her asylum application directly from the INS and discovered that it contained a false story of political persecution.

The last client to testify was Mehmet Ozdemir. He met with Walker at a Turkish coffeehouse in Hempstead, New York, where Walker told a group of immigrants, including Ozdemir, how to obtain work permits. Ozdemir paid a fee, was photographed and fingerprinted and signed blank forms. Later Ozdemir learned that an asylum application had been submitted in his name and that it contained a false story of political persecution.

Two of Walker's former employees also testified for the government. Shureen Mohamed, originally from Guyana, worked as a receptionist and paralegal for Walker from December of 1987 until 1994. Mohamed described the roles that different employees played in Walker's office and testified that Khan and another interpreter, Nazrul Islam Shapon, were responsible for assisting Bangladeshi clients. Walker's fee for obtaining a work authorization was generally $600, with $300 payable in advance. Walker instructed his employees to write an incorrect client address on clients' applications for work permits, so that the work authorization cards would be returned to the INS and then be forwarded to Walker's office. This assisted the office in collecting fee balances from clients who had to go to the office to retrieve their permits.

Another employee, Syed Anwar Rizvi, testified that he worked for Walker as a filing clerk from 1992 until 1993. Rizvi testified about office operations and about how he had helped to fill in the details on a backlog of over a thousand asylum applications, selecting accounts of persecution from a collection of stories that the office kept in a drawer. Walker would sometimes review the completed applications prepared by his staff. Walker usually handled clients from Turkey and Albania himself.

The defense case was brief. Khan called his son, who testified that his father had been hospitalized after being hit by a car on February 28, 1993; that his father returned home from the hospital on March 16, 1993, but was not able to leave his apartment for three or four months; and that his father did not return to work until September of 1993. Khan also briefly recalled Special Agent Craig Vanderhoff. Walker called no witnesses.

At the close of the prosecution's case, the government consented to the dismissal of thirteen counts against Walker, one of which also charged Khan. After deliberating for only five hours, the jury convicted Walker and Khan on the remaining counts against them: eight false statement counts, six mail fraud counts, and the conspiracy count. The district court sentenced Walker to forty-two months in prison, two years of supervised release, a $100,000 fine and a $750 special assessment. Khan was sentenced to five months in prison, five months of home detention, two years of supervised release, a $3,000 fine, and a $300 special assessment. Both defendants appealed.

## DISCUSSION

Walker and Khan challenge their convictions and sentences on a number of fronts. Both contest the sufficiency of the evidence supporting their convictions. Walker also argues that the district court should have excluded the testimony of INS agent David Cartier, while Khan argues that the district court should not have excluded additional, truthful asylum applications that he had prepared. Walker

contends that government misconduct in summation requires reversal of his convictions, and that the jury should not have received a "conscious avoidance" instruction. Both claim errors at sentencing: Walker that he should not have received an enhancement for abuse of a position of trust, and that the district court was unaware of its authority to depart downward due to extraordinary family circumstances, and both defendants that their sentences should not have been increased for the submission of more than 100 false applications. We will examine each argument in turn.

### I. Sufficiency of the Evidence

■ Walker and Khan each challenge the sufficiency of the evidence to sustain their convictions. In considering such a challenge, we review all of the evidence presented at trial "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Hernandez,* 85 F.3d 1023, 1030 (2d Cir.1996). We will affirm a conviction so long as " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Tocco,* 135 F.3d 116, 123 (2d Cir.) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), *cert. denied,* — U.S. —, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998). However, "a conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir.1994) (citing *United States v. Wiley,* 846 F.2d 150, 155 (2d Cir.1988)).

### A. False Statements

■ We have little difficulty sustaining Walker's convictions on the false statement counts. Walker was the attorney of record specifically named on each of the false applications submitted to the INS. Cartier, the INS specialist, testified as to the repeated appearance of nearly identical, boilerplate stories of persecution on applications submitted on behalf of Walker's clients. Vilasini, Akcali, and Perlleshi all testified that Walker was directly involved in their application processes; Perlleshi stated that Walker instructed her to sign blank application forms. Mehmet Ozdemir testified that he met Walker at a coffeehouse where Walker was soliciting a group of people to apply for work permits; the jury could have inferred from this testimony that Walker was aware that false applications would be submitted on these immigrants' behalf. In addition, one of Walker's employees, Rizvi, testified that Walker occasionally would review the completed asylum applications before they were submitted, and that Walker was directly responsible for handling clients from Turkey and Albania. Although Walker insists that only his employees knew that the submitted applications were false, the evidence at trial was more than sufficient to sustain the jury's findings that Walker knowingly caused false statements to be submitted to the INS.

■ Khan was convicted of making false statements to the INS on behalf of three asylum applicants: Golam Belal, Silbester Gomes, and Razi Uddin Ahmed. Belal testified that he called Walker's office in January of 1993, spoke to Khan, and then met with Khan at the office. When Belal told Khan that he needed a work authorization, Khan told him that he had to file an application for asylum and instructed him to sign a blank form. More than two years later Belal first saw the completed copy of his asylum application as filed with the INS. It contained false information regarding his place of birth and date of entry into the United States. Belal discussed these falsehoods and the reasons for them with Khan at Walker's office. The application also contained a fabricated story of political persecution that he had never discussed with Khan or anyone else at Walker's office. Even though Belal also spoke with Shapon, the other Bengali interpreter, when he later returned to the office, the jury was entitled to infer that

Khan, Belal's initial and primary contact, submitted the false statements to the INS.

■ Silbester Gomes also testified to his direct contact with Khan. Gomes went to Walker's office shortly after he arrived in the United States to seek assistance with an asylum application. After Khan asked him to sign a blank form, Gomes paid a fee and told Khan the story of his religious persecution in Bangladesh. Gomes received his work card in August of 1994. When Gomes returned to Walker's office in late 1995 to prepare for his asylum interview, he was surprised to find a false story on his application. Gomes asked Khan about the story, and Khan explained that this was how asylum cases were handled and suggested to Gomes that he acquire papers documenting the false story. Gomes revealed all of this to the INS at his asylum interview in early 1996. The foregoing evidence is easily sufficient to sustain Khan's conviction on the false statement counts that related to the applications of Belal and Gomes.

■ Khan's third count of conviction for false statements, relating to Ahmed, was not supported by direct evidence, and none of Ahmed's documentation could be directly tied to Khan. The government defends this conviction on the ground that Ahmed was from Bangladesh, and the evidence was to the effect that Khan handled some Bangladeshi clients. But the evidence showed that Shapon also worked with clients from Bangladesh, and nothing in the evidence provides a reasonable basis for inferring Khan's responsibility rather than Shapon's. The fact that Ahmed's application contained boilerplate language similar to that found on applications prepared by Khan does not tip the balance against Khan, because the evidence suggested that similar boilerplate stories were used by all of Walker's employees. The evidence tending to prove that Khan prepared Ahmed's false application thus consisted only of the facts that Ahmed was from Bangladesh, that Khan was one of two employees who handled Bangladeshi clients, and that the application contained language used in other applications prepared not only by Khan but also by other employees. This evidence, even with all reasonable inferences drawn in favor of the prosecution, is not sufficient to permit a reasonable fact-finder to find Khan guilty beyond a reasonable doubt. Accordingly we reverse his conviction on that count, and that count is dismissed.

■ Walker and Khan were also each convicted of conspiring to make false statements. The evidence that Walker supervised and instructed Rizvi and others in filling out false applications is more than sufficient to support Walker's conspiracy conviction. We also affirm Khan's conspiracy conviction based on the evidence supporting the two substantive counts that we affirm and the evidence of office operations including the widespread use of false applications. Collectively, this evidence strongly suggests a common plan under Walker's supervision in which Khan was a willing and knowing participant.

## B. *Mail Fraud*

■ Walker and Khan were also convicted under the mail fraud statute, 18 U.S.C. § 1341. Walker argues that there was insufficient evidence that he intended to harm or defraud his clients, the alleged victims of his scheme. He maintains that, by and large, the clients received results they were seeking and that they were not the victims of any fraud.

■ To procure a conviction for mail fraud, the government must prove three elements: (1) a scheme to defraud victims of (2) money or property, through the (3) use of the mails. *See United States v. Dinome*, 86 F.3d 277, 283 (2d Cir.1996). Proof of fraudulent intent, or the specific intent to harm or defraud the victims of the scheme, is an essential component of the "scheme to defraud" element. *See id.*; *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987).

■ The first element focuses on the intent to harm; the second element is concerned with the precise nature of that harm, and requires that the harm be concrete. The "money or property" formulation found in 18 U.S.C. § 1341 has been broadened by statute and caselaw to extend beyond tangible property. The second element can also be satisfied when the defendant's scheme is intended to deprive its victims of "the intangible right of honest services," 18 U.S.C. § 1346, or of the right to control their own assets, *see United States v. Rossomando*, 144 F.3d 197, 201–02 n. 5 (2d Cir.1998); *Dinome*, 86 F.3d at 283. While the scheme to defraud need not have been successful, the defendant must have contemplated some actual harm or injury to the victims. *See Dinome*, 86 F.3d at 283; *D'Amato*, 39 F.3d at 1257.

There is no dispute that the use of the mails by Walker and Khan was sufficient to satisfy the third element of the mail fraud counts. In addition, the government was able to prove that defendants received substantial amounts of money from their clients in the form of legal fees, thus satisfying the second element. Walker's sufficiency challenge turns solely on the evidence underlying the first element, the scheme to defraud, and specifically the proof of intent to defraud Walker's clients.

At trial, the government's theory of Walker's scheme to defraud was that Walker, assisted by Khan and others, exacted legal fees from his clients by submitting false asylum applications on their behalf, regardless of the clients' actual intentions or legal needs. The government described the mail fraud scheme as follows: "Sheldon Walker and his employees were engaged in defrauding the clients ... of their fee by not telling them material information, information that might have led them to walk out of the office and not pay their fee." In its charge to the jury, the district court confined its discussion of intent to defraud to the statement that the jury need find "that the defen-

dants acted ... with the specific intent to deceive their clients for the purpose of causing injury to the client by depriving them of money or property."

This case bears a surface resemblance to *United States v. Starr*, 816 F.2d 94 (2d Cir.1987), in which we reversed the convictions of defendants who had run a mail and package scheme. In that case, as here, the government alleged that the putative victims of the scheme to defraud were the defendants' business clients. In *Starr*, the clients paid the defendants the regular postage rate to ship their packages. *See id.* at 96. Unbeknownst to the clients, the defendants shipped the clients' mail in bulk rate packages at a reduced rate and pocketed the difference. *See id.*

While the *Starr* case featured plenty of mail, and plenty of fraud, we held that there was no statutory mail fraud because the government failed to prove that the defendants intended to harm their victims. The clients got what they bargained for: their packages were delivered to the proper places, at the proper times, for the agreed-upon prices. Thus, the defendants' scheme neither harmed nor contemplated any harm to their clients. As we said in *Starr*, "the harm contemplated [in a scheme to defraud] must affect the very nature of the bargain itself. Such harm is apparent where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" *Id.* at 98 (quoting *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir.1970)). In *Starr*, there was no such discrepancy; the defendants "in no way misrepresented to their customers the nature or quality of the service they were providing." *Id.* at 99.

This case is different. Walker, Khan, and others consistently misrepresented to their clients the nature and quality of the legal services they were providing. Even though some clients received the work authorization they wanted, it was the fruit of

a fraudulent application, about which many clients knew nothing, prepared for a hefty fee.[1] In *Starr*, the clients dealt with the defendants just as they would have dealt with an honest business. Here, the clients were obliged to become parties to a dishonest scheme and were required to sign false statements themselves. Under the circumstances of this case, there was sufficient proof that Walker intended to harm his clients by charging substantial fees for dishonest legal representation. Accordingly, we affirm the convictions for mail fraud.

## II. *Evidentiary Rulings*

Walker and Khan each challenge a separate evidentiary decision by the district court. Walker faults the district court for admitting the testimony of David Cartier, the INS specialist who analyzed the applications received from Walker's office. Khan claims that the district court erred in not admitting the honest asylum applications that he had prepared while working for Walker. We reject both arguments.

### A. *The INS Specialist's Testimony*

■■■■ David Cartier, a research specialist at the INS, testified that of the 1365 asylum applications from Walker's office that he reviewed, many bore accounts of persecution that were very similar or even identical. We reject Walker's claim that this was improper expert testimony because it offered legal conclusions. Cartier's testimony simply summarized and commented on the contents of the applications without opining on the truth or falsity of those accounts or on whether Walker had committed a crime. Moreover, the applications themselves were before the jury and available to the defense for purposes of cross-examining Cartier. We review the admission of this summary evidence for abuse of discretion. *See Fagiola*

*v. National Gypsum Co. AC & S.*, 906 F.2d 53, 56 (2d Cir.1990). Its admission into evidence was well within the discretion of the district court under Fed.R.Evid. 1006.

### B. *Honest Applications*

■■■■ At trial, Khan unsuccessfully sought to introduce asylum applications that he had prepared that contained non-boilerplate, honest accounts of persecution, on the theory that the existence of these honest applications disproved his fraudulent intent in this case. The district court's rejection of this evidence was not error. Whether Khan had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent. *Cf. United States v. Winograd*, 656 F.2d 279, 284 (7th Cir.1981) (finding defendant's performance of some legal trades irrelevant to his knowledge of illegal trades). Accordingly, the district court did not abuse its discretion in excluding this evidence.

## III. *The Government's Summation*

At the close of the summation by Walker's attorney, counsel for the government applauded. He then started his rebuttal by stating to defense counsel, "[T]hat was a phenomenal job. That was phenomenal. Your arguments were terrific. You are the trial lawyer you said you are in the opening. I am sure [the government] really learned something from that." Although defense counsel raised no objection at the time, Walker later made a post-trial motion pursuant to Fed.R.Crim.P. 33 for a new trial, arguing that the prosecutor's behavior was unprofessional and inappropriate, citing *United States v. Burns*, 104 F.3d 529 (2d Cir.1997). Walker also contended that the government's rebuttal misrepresented the trial testimony of Vilasini and Akcali and improperly bolstered Riz-

---

**1.** In addition, the fraudulent applications could have exposed many of the clients to indictment for false statements themselves. At the very least, the applications embroiled several of them in legal difficulty, forcing them to sign cooperation agreements to avoid prosecution.

vi's credibility, and that the cumulative prejudice of this misconduct in rebuttal required reversal. The district court rejected Walker's Rule 33 motion. Walker reiterates these arguments on this appeal.

In *Burns*, we reprimanded the government for inappropriate conduct for applauding at the end of defense counsel's summation, "not out of admiration for the craftsmanship of a fellow advocate, but as a sarcastic commentary on defense counsel's summation." *Id.* at 537. However, we declined to reverse in light of the curative measures taken by the trial court, the isolated nature of the misconduct in the context of the entire trial, and the likelihood of conviction without the applause. *See id.*

Here, the district court found that the government's applause was "clearly out of admiration," and "seemingly represented a strategic acknowledgment of a compelling performance." *United States v. Walker*, No. SI 96 CR. 736, 1998 WL 637488, at *1 (S.D.N.Y. Sept.17, 1998). "At worst," the district court concluded, the applause "represented a permissible theatrical device designed to capture the jury's attention." *Id.* at *2. While we cannot approve the government's entirely unprofessional conduct in purporting to cheer for defense counsel's summation, precisely because it can be taken or mistaken by the jury as inappropriate sarcasm, we agree with the district court that reversal is not required. Given the fact that the occurrence did not prompt a contemporaneous objection—an indication that the incident did not affect the trial atmosphere in a manner disadvantageous to Walker—and given the overwhelming evidence of Walker's guilt, we have no doubt that the verdict would have been the same absent the applause and commentary.

We also reject Walker's other allegations of misconduct during the government's rebuttal. The government's characterization of the testimony from Vilasini and Akcali was fair argument, with an adequate evidentiary basis in the record, and the government did not improperly bolster Rizvi's credibility. We reject these arguments largely for the reasons stated by the district court. *See id.* at *2–3.

## IV. *Conscious Avoidance*

Walker contends that it was error for the district court to give the jury a conscious avoidance instruction. We have previously held that "[a] conscious-avoidance instruction is appropriate when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." *United States v. Gabriel*, 125 F.3d 89, 98 (2d Cir.1997) (quoting *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1195 (2d Cir. 1989)). This was Walker's precise claim at trial, and this is a paradigmatic case of when a conscious avoidance charge is appropriate. Walker argued that responsibility for any false applications rested solely with his employees, and that he knew nothing of their wrongdoing. However, Walker supervised his employees and occasionally reviewed their completed applications, Akcali confronted Walker about a false story on his application, and Walker himself instructed Perlleshi to sign blank forms that later contained a false account of persecution. This and other evidence easily supported the inference that even if Walker did not have direct knowledge of the crimes occurring in his office, he deliberately remained ignorant of them. Under these circumstances, the charge was proper.

## V. *Sentencing Issues*

Walker and Khan also challenge their sentences. Walker argues that he should not have received an enhancement for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3, and that the district court misapprehended its authority to depart downward due to his extraordinary family circumstances. In addition, both defendants maintain that they should not have received the six-level increase pursu-

ant to U.S.S.G. § 2L2.1(b)(2)(C) that was imposed because the offense involved more than one hundred false statements.

### A. Enhancement for Abuse of a Position of Trust

 Walker, an attorney, submitted false asylum applications on behalf of hundreds of immigrants, many of whom had no idea that such an application was being submitted at all. Section 3B1.3 of the Sentencing Guidelines states that the offense level will be increased when a defendant "abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The first application note describes such a position as being "characterized by professional or managerial discretion." *Id.* at app. n. 1. Whether a position is one of "trust" within the meaning of the guidelines is a question of law subject to *de novo* review; whether the defendant used the position to facilitate significantly the commission of the offense is a question of fact that we review only for clear error. *See United States v. Laljie*, 184 F.3d 180, 194 (2d Cir.1999).

 Walker argues that it was inappropriate for the district court to apply the abuse of a position of trust enhancement because 1) he did not have a fiduciary relationship with his clients, and 2) he did not exercise any discretion with regard to his clients' representation. We reject this argument. As a general matter, an attorney occupies a position of trust with regard to his clients. *Cf. United States v. Carrozzella*, 105 F.3d 796, 800–01 (2d Cir. 1997) (holding that a trustee in probate court holds a "position of trust"). Walker cannot hide behind the poor quality of his representation to avoid the reach of this sentencing enhancement. He possessed the discretion to determine how to handle each of his clients' cases, and he abused that discretion when he elected to submit or direct the submission of fraudulent applications on their behalf. It was not clearly erroneous for the district court to determine that Walker's position of trust as an attorney facilitated his crimes; his position and his ability to represent clients in immigration proceedings made the crimes possible in the first instance.

### B. Extraordinary Family Circumstances

 Walker also argues that the district court erred in refusing to depart downward from the sentencing guideline range due to his extraordinary family circumstances. In particular, Walker argues that his responsibilities as a parent to an adopted son with drug problems merited a downward departure, and that the district court was unaware of its power to depart on that basis.

 In this circuit a district court may depart downward in sentencing a defendant due to extraordinary family circumstances. *See United States v. Galante*, 111 F.3d 1029, 1033 (2d Cir.1997); *United States v. Johnson*, 964 F.2d 124, 128–29 (2d Cir.1992). However, these departures must be reserved for situations that are truly extraordinary. *See Galante*, 111 F.3d at 1038–39 (Kearse, J., dissenting). A decision not to depart from the guidelines is ordinarily not reviewable by this court, *see United States v. Brown*, 98 F.3d 690, 692 (2d Cir.1996) (per curiam), but we may review a failure to depart if there is "clear evidence of a substantial risk that the judge misapprehended the scope of his departure authority," *id.* at 694; *see also United States v. Galvez–Falconi*, 174 F.3d 255, 257 (2d Cir.1999).

 There is no such evidence in this case. The district court stated at sentencing that "the guidelines do not permit a departure" due to Walker's obligations as a husband and father, but we understand the district court to have meant that no departure would be permitted under the specific circumstances of this case. A district court is presumed to be aware of the scope of its ability to depart downward, *see*

*Brown,* 98 F.3d at 694 (recognizing a "strong presumption" that a district judge is aware of his discretion to depart), and one isolated statement in the context of this case is insufficient to rebut that presumption. We will not revisit the district judge's decision not to depart downward for extraordinary family circumstances.

### C. *Number of False Statements*

 Walker and Khan both challenge the district court's decision to increase their offense levels by six levels pursuant to U.S.S.G. § 2L2.1. The guideline (as it existed in November of 1995) required a six-level increase in the offense level if the offense of conviction involved more than one hundred false documents. *See* U.S.S.G. § 2L2.1(b)(2)(C) (1995).

The evidence adduced at trial supports the inference that Walker's office was responsible for the submission of hundreds, if not thousands, of false applications. Rizvi testified that he processed thousands of false applications, and Cartier testified that hundreds of applications bore boilerplate accounts of persecution. This evidence easily sufficed to prove by a preponderance of the evidence that Walker was involved in the submission of more than one hundred false documents.

 With regard to Khan, however, we are not persuaded that the government met its burden of proof that he was responsible for one hundred or more false applications. Unlike Walker, Khan does not bear responsibility for every application that left the office. The government attempts to rely solely on the Cartier analysis to support the increase in Khan's offense level. However, there is even less evidence connecting Khan to the individual false applications referenced by Cartier than there was to the Ahmed application as to which we believe Khan's conviction must be reversed. Given the dearth of evidence connecting Khan to individual applications, and the equally strong probability that applications of Bangladeshis not specifically tied to Khan are attributable to another employee, it was error to sentence Khan for the additional applications submitted by Walker's office. As a result, we vacate Khan's sentence and remand the case to the district court for resentencing.

We have considered defendants' remaining arguments and find them to be without merit.

### CONCLUSION

For the reasons stated above, we affirm all of Walker's convictions, reverse Khan's false statement conviction on count 13, and affirm Khan's convictions on the remaining counts. We affirm Walker's sentence, and we vacate Khan's sentence and remand for resentencing.

Affirmed in part, reversed in part, and remanded.