United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 11, 2003**

Charles R. Fulbruge III
Clerk

REVISED JUNE 13, 2003

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-40525

_____

UNITED STATES OF AMERICA.,

Plaintiff-Appellee

v

DONNIE DARRELL BOOKER.,

and PABLO RUIZ

Defendants-Appellants

_____

Appeal from the United States District Court

for the Eastern District of Texas

_____

Before JONES and BENAVIDES, Circuit Judges, and KAZEN, District Judge.[1]

KAZEN, Chief District Judge:

---

[1] Chief District Judge of the Southern District of Texas, sitting by designation.

1

A 24-count indictment was returned against 16 defendants, including appellants Donnie Darrell Booker ("Booker") and Pablo Ruiz ("Ruiz"), as well as John Catlin, Sr., and Cedric Catlin. Count 1 of the indictment charged all of the defendants with conspiracy to distribute 50 grams or more of cocaine base ("crack cocaine" or "crack"), in violation of 21 U.S.C. § 846. Booker was also charged in counts 7, 13 and 17 with distributing crack cocaine on or about June 16, 2000, August 24, 2000, and January 13, 2001, respectively. Twelve co-defendants pled guilty to various charges. Booker, Ruiz and the two Catlins proceeded to trial, but John Catlin Sr., was severed during the trial due to illness. Booker filed a motion to sever himself from the other defendants and for a separate trial on each count, which the district court denied.

All three remaining defendants were found guilty as charged by a jury, except that Booker was found not guilty on Count 17. Ruiz was sentenced to 88 months' imprisonment and 4 years of supervised release. Booker was sentenced to 151 months' imprisonment and 5 years of supervised release. Both appellants dispute the sufficiency of the evidence to convict them and the calculation of their sentences.[2] Booker also protests the denial of his severance motion and of a motion for post-trial juror interviews. Ruiz complains of two evidentiary rulings. We AFFIRM both convictions and Booker's sentence, but VACATE Ruiz's sentence and REMAND for resentencing.

## I. Sufficiency of the Evidence

In evaluating sufficiency of the evidence, this court must affirm if any "reasonable construction of the evidence" could establish the defendant's guilt beyond a reasonable doubt. *United States v. Bermea*, 30 F.3d 1539, 1551 (5th Cir. 1994). A conviction for conspiracy to

---

[2] Cedric Catlin also appealed, but on December 16, 2002, that appeal was dismissed.

distribute a controlled substance, 21 U.S.C. § 846, requires proof of (1) an agreement between two or more persons to violate the narcotics laws, (2) the defendant's knowledge of the agreement, and (3) the defendant's voluntary participation in the conspiracy. *U.S. v. Gallardo-Trapero*, 185 F.3d 307, 316 -17 (5th Cir. 1999). "The agreement may be tacit, and the jury may infer its existence from circumstantial evidence." *United States v. Crooks,* 83 F.3d 103, 106 (5th Cir.1996). Conviction of a distribution charge in violation of 21 U.S.C. §§ 841(a)(1) requires proof that the defendant knowingly delivered a controlled substance to someone else. *United States v. Sotelo*, 97 F.3d 782, 789 (5th Cir. 1996). A defendant may be convicted on the uncorroborated testimony of a co-conspirator who has accepted a plea bargain unless the coconspirator's testimony is incredible. *United States v. Villegas-Rodriguez*, 171 F.3d 224, 228 (5th Cir. 1999). Testimony is incredible as a matter of law only if "it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." *Bermea,* 30 F.3d at 1552.

### A. Booker

Booker argues that there was insufficient evidence to support his conviction because he lived in Texas for only a part of the conspiracy and because he did not appear on any of the video or audio surveillance. He also complains that, while he might have been present during the drug deals made on June 16, 2000 and August 24, 2000, the Government failed to link the drugs exclusively to him. Finally, Booker argues that the majority of testimony against him was provided by drug dealers and crack addicts, whose testimony was inherently self-serving and unreliable.

3

The evidence depicted a drug conspiracy primarily involving the Catlin family in Denton, Texas. The investigation focused on two residences and one nightclub. Zella Mae Catlin and John Catlin, Sr. owned one of the houses. Their son, John Catlin, Jr., (aka Popcorn) owned the other house, and the club. Members of the extended Catlin family as well as some neighbors and other drug users were also involved in buying and selling crack cocaine. Booker was a cousin of the Catlins who lived with Zella Mae Catlin and John Catlin, Sr., during 2000 and 2001.

During the time Booker lived at the Catlin house, drug traffic was so frequent that there were worn trails leading to and from the house. Numerous individuals testified that they had purchased crack from Booker. One witness testified that he alone had dealt with Booker at least 50 times. Some of these purchases were in controlled buys, witnessed by undercover officers. Testimony from co-conspirators indicated that Booker was not merely an independent operator, but that he had participated in at least one larger drug deal with Popcorn Catlin. The June 16, 2000 crack sale was a controlled buy, and both the purchaser and an undercover officer testified that Booker sold the crack in that transaction. Popcorn testified that Booker volunteered to participate with him in the August 24, 2000 transaction. While Popcorn negotiated that transaction, it was Booker who actually handed the bag of crack to its purchaser, undercover officer Cogwell. A reasonable juror could have easily concluded that Booker was guilty of participating in a conspiracy to distribute crack cocaine and did distribute crack on June 16 and August 24, 2000.

## B. Ruiz

Ruiz claims that the evidence showed only a buyer-seller relationship between himself and the Catlins, and that this relationship does not constitute a conspiracy. In addition, Ruiz claims no

4

knowledge that the Catlins were crack dealers and that his dealings with the Catlins involved powder cocaine but not crack.

Popcorn Catlin testified that Ruiz knew he was a crack dealer and was eager to provide him with drugs. Popcorn described how Ruiz had attempted to sell him marijuana, and had given him a couple of bags of marijuana to smoke. Popcorn never purchased any marijuana from Ruiz, and informed him that he was not in the marijuana business. Popcorn also testified that he had known Ruiz for six years, that Ruiz's cousin was Popcorn's neighbor, and that Ruiz had previously sold him an ounce of powder cocaine on one occasion and a half of an ounce subsequent to that.

In addition, Paul Cogwell, an undercover officer, described a meeting with Ruiz and Popcorn on September 22, 2000, concerning a potential cocaine deal. Some of the discussion was recorded. This meeting took place after Cogwell had negotiated with Popcorn to buy a half-kilo of crack for approximately $10,000. The deal was in jeopardy because Popcorn's intended supplier was intercepted by police officers in Lewisville, TX. Popcorn admitted that this deal would be the largest he had ever done, and he believed Cogwell urgently wanted the drugs. Hoping to keep Cogwell interested in the deal, Popcorn called several people, including Ruiz, to see if they could supply Cogwell with drugs. After reaching Ruiz by telephone, Popcorn met him and brought him to Cogwell. Cogwell and Ruiz discussed bringing in a large amount of cocaine from Mexico. They discussed the potential amount of drugs, their price, and different means for getting them to Cogwell. Ruiz and Cogwell also discussed the possible transportation of marijuana. Although no deal was ever reached between Cogwell and Ruiz, a reasonable jury could conclude that Ruiz was participating in the overall Catlin conspiracy by attempting to help a

5

key member of that conspiracy keep a buyer satisfied. "To be convicted of engaging in a criminal conspiracy, an individual need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." *U.S. v. Garcia Abrego*, 141 F.3d 142, 155 (5th Cir. 1998) (internal citation omitted).

## II. Evidentiary Objections

### A. Rule 404(b)

Ruiz contends that the district court abused its discretion by admitting evidence of his possession of 178 kilograms of marijuana at his residence in Starr County, Texas. This seizure occurred on June 21, 2001, almost six weeks after the indictment was filed in this case. The evidence was admitted to show intent, pursuant to Fed. R. Evid. 404(b). Ruiz argues that this evidence only allowed the jury to see him as a drug dealer and provided no evidence of his intent to be involved in the crack conspiracy in North Texas. He also argues that any probative value of this evidence was substantially outweighed by its prejudicial effect on the jury.

This court applies a highly deferential standard in reviewing a district court's evidentiary rulings, reversing only for abuse of discretion. Even then, the error is not reversible unless the defendant was prejudiced. *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996). To be admissible under Rule 404(b), evidence must be relevant to an issue other than the defendant's character and must possess probative value not substantially outweighed by the danger of unfair prejudice. *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978), *cert. denied*, 99 S.Ct. 1244, (1979). The mere entry of a not guilty plea in a conspiracy case raises the issue of intent sufficiently to justify the admissibility of extrinsic offense evidence. *U.S. v. Broussard,* 80 F.3d

6

1025, 1040 (5th Cir. 1996). The second part of the *Beechum* test "calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense." *Beechum* at 914. The probative value of the evidence, the Government's need for the evidence on the issue of intent, and the court's limiting instructions are all relevant. *United States v. Richards*, 204 F.3d 177, 199 (5th Cir. 2000). Several factors affect the probative value of the evidence, including the extent to which unlawful intent is established by the other evidence, the similarity between the extrinsic and charged offenses, and the amount of time that separates the extrinsic and charged offenses. *Id.* at 200, *quoting United States v. Chavez,* 119 F.3d 342, 346-47 (5th Cir. 1997).

Ruiz's possession of a large amount of marijuana was important evidence to corroborate Ruiz's conversations with Popcorn and Cogwell that he was willing and able to provide large amounts of narcotics. It also served to contradict Ruiz's defense that his only relationship with Popcorn involved interest in a painting job. Additionally, any prejudice was minimized by the district court's instruction that the challenged evidence could be considered only for the limited issue of determining if Ruiz had the necessary intent to commit the crime of conspiracy.

### B.      Tape Recording

Ruiz contends that the district court erred in admitting the audiotape and transcript of the conversation between himself, Popcorn and Cogwell that took place on September 22, 2000, because the tape was so unintelligible as to be untrustworthy. He notes that the Government conceded the tape was difficult to understand, and he argues that the transcript, rather than the tape, became the real evidence.

Poor quality and partial unintelligibility do not render tapes inadmissible unless the unintelligible portions are "so substantial as to render the recording as a whole untrustworthy."

7

*United States v. Dukes*, 139 F.3d 469, 473 (5th Cir. 1998), *cert. denied,* 119 S.Ct. 215 (1998).

In *United States v. White*, this Court affirmed the use of a transcript of the translation of a Spanish language tape, half of which was conceded to be unintelligible. 219 F.3d 442, 448, 449 (5th Cir. 2000). Because there was testimony from an FBI agent regarding the accuracy of the translation and a cautionary instruction given to the jury, we found no abuse of discretion in admitting the transcript of the tape. *Id.* at 449.

The recorded conversation in this case was in English, and much of its content is undisputed. Two of the three speaking parties affirmed the accuracy of the transcript, and the district court instructed the jury to disregard the transcript if it did not accurately reflect the audio recording. The district court did not abuse its discretion in admitting the audio tape.

## III. Sentencing Issues

Both parties object to the calculation of their sentences. Booker objects to the increase in his offense level for possession of a firearm during the conspiracy, arguing that there was insufficient evidence to establish his possession of a firearm or that the firearm was connected to the conspiracy. Booker also protests the amount of crack cocaine used to calculate his guideline offense level. Ruiz objects to the conversion of the powder cocaine he sold Popcorn to crack for sentencing purposes. He also objects to including in his sentencing calculation the marijuana later seized at his Starr County residence.

The district court's findings of fact at sentencing are reviewed for clear error, and its application of the sentencing guidelines is reviewed *de novo. See United States v. Anderson*, 174 F.3d 515, 524 (5th Cir. 1999). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced

that, had it been sitting as a trier of fact, it would have weighed the evidence differently. *Bermea*, 30 F.3d at 1575.

### A.    Booker

Sentencing Guideline § 2D1.1(b)(1) instructs the sentencing court to increase a defendant's base offense level by two points "[i]f a dangerous weapon (including a firearm) was possessed during commission of the offense." The offense level should be increased "unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 Application Note 3; *see also, United States v. Hewin,* 877 F.2d 3, 5 (5th Cir.1989).  The weapon need not have played an integral role in the offense nor be sufficiently connected with the crime to warrant prosecution as an independent firearm offense.  *See United States v. Villarreal*, 920 F.2d 1218, 1221 (5th Cir. 1991).  The guideline adjustment is warranted if a preponderance of the evidence shows a temporal and spatial relationship between the weapon, the drug trafficking activity, and the defendant. *United States v. Eastland,* 989 F.2d 760, 770 (5th Cir.), *cert. denied,* 114 S.Ct. 246  (1993).

Jessie Brice, a drug dealer, testified that Booker was in possession of a gun during an argument over some missing cocaine at the house of Odell Lucas, where Brice had purchased cocaine in the past.  Booker argues that even if this testimony were true, the gun was utilized only to settle a personal argument and had nothing to do with the conspiracy.   This incident occurred in February 2001, during the life of the conspiracy.  Because this confrontation took place in the course of the drug trafficking activity, the district court did not abuse its discretion in enhancing Booker's sentence based on the possession of the firearm.

9

Booker also argues, in a distinctly conclusory manner, that he should have been held responsible for less than 50 grams, instead of approximately 238 grams, of crack. Booker was convicted of distributing 1.14 grams of crack cocaine on June 16, 2000, and of distributing approximately 237 grams of crack cocaine on August 24, 2000. His objection is apparently based on his position that there was insufficient evidence to support his two distribution convictions, but we have concluded otherwise. Moreover, Booker's sentence calculation did not include dozens of other drug transaction in which he participated. His sentencing objection has no merit.

**B.     Ruiz**

Popcorn Catlin testified that, on two occasions, he bought from Ruiz a total of approximately 1.5 ounces of powder cocaine. At sentencing, Ruiz was held responsible for a total of 557.2 kilograms of marijuana. Part of this total was obtained by first converting the 1.5 ounces of powder cocaine to 18.98 grams of cocaine base[3] and then converting that amount to 379 kilograms of marijuana. In a case involving different drugs, the sentencing guidelines direct that each type of drug be converted to its marijuana equivalent and then added to determine the base offense level from the drug quantity table. U.S.S.G. § 2D1.1, Application Note 10. Ruiz objects to the initial conversion of the 1.5 ounces of the powder cocaine into crack because there is no direct evidence that the powder was actually ever converted to crack.

Conversion of powder cocaine to crack cocaine for sentencing purposes is permissible if such conversion was foreseeable to the defendant. *United States v. Alix*, 86 F.3d 429, 437 (5th

---

[3]The Presentence Report relied upon contact with a DEA chemist who explained that considering "the standard molecular weight of cocaine and cocaine base, 1.5 ounces of powder cocaine could be converted to 37.9 grams of cocaine base." The chemist supposedly further explained, however, that a 50% conversion rate was "more conservative and realistic," thereby yielding the 18.98 grams of cocaine based used in the sentencing formula. Defendant does not attack the conversion rate itself.

Cir. 1996). Popcorn had known Ruiz for six years, and Ruiz knew he was a crack dealer. When Ruiz had offered Popcorn marijuana, he had informed Ruiz that he was only interested in purchasing cocaine. The district court did not err in concluding that the powder cocaine would likely be converted to crack. More importantly, a conspirator's liability is not limited to conduct personally committed by him. Instead, he is responsible for all reasonably foreseeable acts or omissions of other conspirators in furtherance of the jointly undertaken criminal activity. USSG § 1B1.3(a)(1)(B).[4] Based on the evidence discussed above, Ruiz could easily foresee that the conspiracy in question involved at least 18.98 grams of crack.

Ruiz further complains of the inclusion of the 178 kilos of marijuana later found in his residence as relevant conduct for sentencing. District courts are permitted to consider at sentencing an unadjudicated offense which occurs after the offense of conviction if that offense is "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). The parties confine their arguments to the "same course of conduct" prong of that provision. Offenses are part of the same course of conduct if they are "sufficiently connected or related to each other to warrant a conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, Application Note 9(B). The factors to consider in making this determination include "the degree of similarity of the offenses, the regularity of the offenses, and the time interval between the offenses."[5] *Id.* When one of these

---

[4]"With respect to offenses involving contraband. . . the defendant is accountable for. . . all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 Application Note 2.

[5]While this terminology is similar to that used in Rule 404(b) evaluations, the focus of the inquiry is different. "Under Rule 404(b), the question is whether the conduct is close enough in time and similar enough in nature to be relevant to a determination of intent, knowledge, etc. In contrast, the issue under §1B1.3 is whether the conduct is close enough in time and character to constitute a single course of conduct or common scheme...conduct which satisfies

11

factors is absent, a stronger presence of at least one of the other factors is required. *Id.*; *United States v. Wall,* 180 F.3d 641, 645 (5th Cir. 1999).

This court has generally used a year as the benchmark for determining temporal proximity. *United States v. Ocana*, 204 F.3d 585, 590 (5th Cir. 2000). Here, the marijuana seizure on Ruiz's property occurred in June 2001, approximately nine months after Ruiz's last known participation in the crack conspiracy. Although the record is not entirely clear on the exact dates,[6] there was definitely a further temporal distance between the marijuana seizure and the sales of powder cocaine between Ruiz and Popcorn. More importantly, there is virtually no similarity between the marijuana seizure and the offense of conviction. As the Government has insisted at sentencing and on appeal, "the case centered around the conspiracy to manufacture and distribute cocaine base." Appellee Brief, page 38. It had nothing to do with marijuana. Indeed, Popcorn Catlin had previously declined to purchase marijuana from Ruiz, and there is no evidence of marijuana sales by or to any other conspirator. The crack conspiracy centered around the Catlins in North Texas, while the marijuana was found in Ruiz's residence, at least 500 miles away. There is no evidence that the crack conspiracy and the marijuana seizure "shared a common source, supplier, or destination." *Wall,* 180 F.3d at 646. The only similarity is "the fact that the offenses involved drugs," which is not sufficient. *United States v. Miller,* 179 F.3d 961, 967 (5th Cir. 1999); *Wall*, 180 F.3d at 646-647. The record also lacks a strong showing of regularity.

---

the Rule 404(b) test may nevertheless not constitute relevant conduct for sentencing purposes." *United States v. Ruiz*, 178 F.3d 877, 881 (7th Cir. 1999).

[6]This case was tried in December 2001. It was clear from Popcorn's trial testimony that his cocaine purchases from Ruiz occurred sometime before the September 2000 meeting between them and Cogwell. When asked the date of the first cocaine purchase, Popcorn replied, "about a year ago." In context, this answer could not mean a year before the trial. It seems likely that Popcorn meant a year before the September 2000 meeting, but the precise date was never clarified.

Amid the extensive evidence of repeated crack transactions and numerous conspirators, Ruiz appears selling a small amount of powder cocaine to one conspirator on two separate occasions some time in early 2000. Then, when the primary supplier of Popcorn's crack is unavailable in September 2000, Ruiz participates in a fruitless discussion to bridge the gap. Nine months later and hundreds of miles away, marijuana is found stored on his property. In sum, when comparing the crack conspiracy offense and the marijuana seizure, there is a total absence of similarity and close questions of temporal proximity and regularity. We conclude that the seized marijuana should not have been considered for sentencing purposes under the relevant conduct standard.

## IV.    Remaining Issues

Booker contends that the district court abused its discretion by failing to sever his case from that of his co-conspirators. In conclusory fashion, Booker contends that he was the only defendant at trial with no criminal record, that he was not involved to the extent of his alleged co-conspirators, and that he was prejudiced by a "spill-over" effect. The denial of a motion to sever is reviewed for an abuse of discretion. *United States v. Peroza*, 78 F.3d 179, 184 (5th Cir. 1996). Defendants named in the same indictment should generally be tried together, particularly when they are allegedly members of a conspiracy. *United States v. Manges*, 110 F.3d 1162, 1174 (5th Cir. 1997). A general description of complexity or antagonistic defenses is not sufficient to show the "specific and compelling prejudice" necessary for reversal of a district court's denial of a motion to sever. *Richards*, 204 F.3d at 193-95. Instead, an appellant must "isolate events occurring in the course of the trial and then. . . demonstrate that such events caused substantial prejudice." *United States v. Posada-Rios*, 158 F.3d 832, 863 (5th Cir. 1998), *cert denied*, 119 S.Ct. 1280 (1999).

13

Booker fails to even remotely identify any particular prejudice. This trial proceeded with only four defendants and one was severed during the trial due to illness. As stated in *Richards*, a drug conspiracy case that also involved three defendants, a district court's decision to deny severance has been upheld "in cases involving many more defendants, more evidence, greater complexity and longer trials." 204 F.3d at 193. Further, appropriate cautionary instructions can decrease the "possibility that the jury will improperly transfer proof of guilt from one defendant to another." *Id.* at 194. In this case, the district court specifically instructed the jury to consider the evidence for each defendant separately. Booker's severance point has no merit.

Booker also complains that the district court erroneously denied his request for permission to interview the jurors after the verdict. Booker argues that there was "extensive controverted evidence" of his guilt on Count 13, for which he was convicted, while there was very little dispute regarding his guilt on Count 17, for which he was acquitted. He maintains that he simply wanted to know if the jury made a mistake on the verdict form.

A trial court's decision to deny an attorney's request for post-trial interviews of the jury is reviewed for abuse of discretion. *United States v. Sotelo*, 97 F.3d 782, 794 (5th Cir. 1996); *Salinas v. Rodriguez*, 963 F.2d 791, 794 (5th Cir. 1992). Only where there is a showing of illegal or prejudicial intrusion into the jury process will the court sanction such an inquiry. *U.S. v. Varela-Andujo*, 746 F.2d 1046, 1049 (5th Cir. 1984); *see also* Fed. R. Evid. 606(b). Because there were no allegations of external influence, the district court did not abuse is discretion in denying Booker post-trial interviews with the jurors. Moreover, since we have found sufficient evidence to convict Booker on Count 13, any possible jury error in acquitting him on Count 17 would have been a windfall.

14

For the foregoing reasons, we AFFIRM the conviction of both defendants and the sentence of Booker. We VACATE Ruiz's sentence and REMAND to the district court for resentencing in accordance with this opinion.