# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 18, 2010

No. 08-51260

Charles R. Fulbruge III
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE ALFONSO CHARLES; NADINE GOMEZ CHARLES,

Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Texas
No. 4:08-CR-138-1

Before JONES, Chief Judge, SMITH and ELROD, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Jose Charles and his wife, Nadine Charles, appeal their jury convictions of aiding and abetting the possession with intent to distribute 100 kilograms or more of marihuana. *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 08-51260

I.

The trial adduced the following facts: While on patrol near Presidio, Texas, Border Patrol Agent Luis Bustamante stopped a recreational vehicle ("RV") near the Rio Grande River. The driver, Rudy Portillo-Lopez, consented to a search, which revealed no contraband. Later that evening, Border Patrol Agent Cipriano Amaro, Jr., stopped the RV at the Marfa checkpoint. Portillo-Lopez and the RV's passenger, Ignasio Camacho-Orozco, told Amaro that they had been in Presidio visiting relatives. Portillo-Lopez again consented to a search, which this time revealed contraband. Amaro testified that the search revealed approximately 387.10 pounds of marihuana.

Portillo-Lopez told the jury he had pleaded guilty of possession with intent to distribute over 100 kilograms of marihuana. He was in need of money, so he talked to Jose and Nadine about running marihuana. On one occasion, he met with Jose, Nadine, and Camacho-Orozco at the Charleses' house in Abilene, Texas, where they discussed an upcoming drug deal. The plan was for Portillo-Lopez to follow Jose and Nadine to the location of the drugs, then load them into the RV. Jose and Nadine told Portillo-Lopez that the RV was stocked with food and suggested that he bring along a woman so that he would look less suspicious. In return for his services, Jose offered to pay Portillo-Lopez $3,500.

Portillo-Lopez further testified that after the discussion, he went with Jose, Nadine, and Camacho-Orozco in Jose and Nadine's car to pick up the RV at an RV park in Tye, Texas. (An employee at the Tye RV Park later testified that Jose and Nadine signed an agreement to rent a space at the park.) Jose gave him a piece of paper with phone numbers on it, which was in Portillo-Lopez's possession when he was arrested. Portillo-Lopez drove the RV to Presidio, following Jose, Nadine, and Camacho-Orozco, and maintaining contact with them via cellular phone as he drove.

The four arrived in Presidio in the evening and slept together in the RV.

No. 08-51260

The next day, they had breakfast and "[waited] on phone calls." Later that day, Portillo-Lopez and Camacho-Orozco drove the RV west of Presidio and pulled off the road at a marked spot, where people arrived with backpacks and "unloaded [the marihuana] twice."

With the drugs onboard, Portillo-Lopez drove the RV toward Presidio, where he was stopped by the Border Patrol. After authorities searched the RV and found nothing, the men were allowed to proceed. As they approached Marfa, Texas, Portillo-Lopez saw Jose's car pass him. The Border Patrol then stopped the RV again, conducted a successful search, and arrested Portillo-Lopez, who testified that after he was arrested, he received $100 in an envelope that had the Charleses' house as its return address.

Cellular phone records show that Jose made numerous phone calls in the Presidio area during the time that the trip took place and that Jose and Portillo-Lopez exchanged phone calls on those days. In Jose and Nadine's house, officials found a trace of cocaine, a small quantity of marihuana, a container filled with various-sized ziplock bags, and a digital scale. Testimony indicated that the bags were of a type commonly used to package drugs for resale and that digital scales are commonly used by drug traffickers.

Officers also found notebooks, in the office at the Charleses' residence, containing entries of names, quantities, and monetary amounts. An officer testified that drug traffickers use such notebooks and ledgers to keep track of amounts payable and expenses for picking up narcotics. Jose and Nadine unsuccessfully objected to the admission of the notebooks as not relevant and containing hearsay.

DEA Agent Alison Yates––who took custody of the marihuana, Portillo-Lopez, and Camacho-Orozco––testified that she seized 190 bundles of marihuana. Yates did not state the weight of the bundles or provide a total weight but did testify that 387.10 pounds of marihuana is equivalent to 175.6 kilograms. DEA

3

No. 08-51260

forensic chemist Paul Adams provided testimony regarding DEA's methods of weighing controlled substances. When the government sought to introduce the lab report through Adams's testimony, the defense objected. After deciding that Yates had not weighed the marihuana herself, the court sustained the objection and redacted the gross weight from the lab report.

DEA Agent Chad Lloyd, who assisted in the arrest of Jose and Nadine, testified that Jose confessed to him that he had traveled to Presidio with persons named Rudy, Ignasio, and Nina in an attempt to smuggle marihuana. When Lloyd asked who Nina was, Jose answered that she "was his mistress." Lloyd further testified that when Jose was led out of the house, he saw Nadine. Jose told her not to worry, because he had informed them that she was not with him. After her arrest, Nadine claimed that she had never been to Presidio. Lloyd further testified that when he arrested Nadine, he recognized her because he had arrested her a few months earlier in connection with a seizure of 48 kilograms of marihuana in Del Rio, Texas.

At the conclusion of the government's case, Jose moved for judgment of acquittal. He argued that the evidence was insufficient to support his conviction because, aside from the statement of an accomplice, there was no evidence to connect him to the marihuana and that there was insufficient evidence of the actual weight of the marihuana. Nadine also moved for judgment of acquittal, contending that the government had failed to set forth evidence that established the elements of the offense.

Jose testified that he had no knowledge that a drug transaction was taking place. He stated that Camacho-Orozco worked at his construction business and was living at his house. Jose said he was "led to believe" that Camacho-Orozco owned the RV, and he averred that Camacho-Orozco persuaded him to rent the space at the RV park on Camacho-Orozco's behalf. Because business was slow, Camacho-Orozco indicated that he was moving to Presidio, and Jose asserted

that he accompanied Camacho-Orozco to be there if the RV broke down. Jose further stated that Nadine did not go on the trip to Presidio; the woman who accompanied them on the trip to Presidio was "a lady friend of Mr. Camacho" named Angie. Jose later admitted, however, that his wife, Nadine, did in fact accompany him on the trip.

Jose further testified that, contrary to Portillo-Lopez's testimony, he had not passed the RV on the road to Presidio, because at that time he was returning to Abilene. He subsequently acknowledged, however, that his cell phone records showed that he was near the Presidio tower at that precise time. Jose further claimed that, contrary to Lloyd's testimony, he had not admitted to Lloyd that he had driven to Presidio to smuggle drugs.

Nadine did not testify. The defendants rested and renewed their motions for judgments of acquittal, which the district court denied. The jury found Jose and Nadine guilty as charged. As part of its guilty verdicts, the jury specifically found that the substance at issue was at least 100 kilograms of marihuana.

## II.

Jose raises three issues on appeal. He contends (1) that his sentence exceeded the statutory maximum, (2) that allowing the government to introduce a prior crime was error, and (3) that the evidence is insufficient to support his conviction.

## A.

Jose claims that his sentence exceeds the statutory maximum. Specifically, he argues that the government failed to present admissible evidence regarding the weight of the marihuana. The only discussion of drug weight, he says, came from Amaro, and "[a]lthough Amaro did indicate that he believed the substance to be marihuana and that it weighed approximately 387 pounds, the gov-

ernment failed to establish how Amaro came to believe that figure."

Jose's indictment alleged a quantity of "100 kilograms or more." That allegation thus triggered punishment within the statutory range of § 841(b)(1)-(B)(vii).  *See United States v. DeLeon*, 247 F.3d 593, 596 (5th Cir. 2001).  Jose's sentence, at the top of the guidelines range, was based in part on the fact that there was "387.10 pounds or 175.59 kilograms" of marihuana.  Drug quantity was, then, an element of the offense under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), and the issue of quantity had to be submitted to a jury for a finding of proof beyond a reasonable doubt.  *See United States v. Doggett*, 230 F.3d 160, 164-65 (5th Cir. 2000).

That is precisely what happened here.  As required, the jury specifically determined that the substance was at least 100 kilograms of marihuana.  Jose does not argue that his indictment was insufficient under *Apprendi* or that the jury did not consider the issue.  Thus, although Jose phrases the issue in terms of the statutory maximum, he is essentially contending that the evidence was insufficient to establish the drug quantity that was set forth in the indictment, because the only evidence of weight was inadmissible.

Jose preserved his sufficiency argument by making it at the close of the government's case and again at the close of the defense's.  Consequently, our usual standard for sufficiency review applies to the jury's drug quantity determination.  *See DeLeon*, 247 F.3d at 596 n.1.  We examine all the evidence in the light most favorable to the verdict, and we "affirm the conviction if we determine that a reasonable trier of fact 'could have found that the evidence established the essential elements of the crime beyond a reasonable doubt.'"  *Id.* at 596 (quoting *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998)).

Jose claims that the government's witnesses did not establish the weight of the seized marihuana.  For instance, Yates and Adams provided general testimony regarding DEA methods of weighing drugs and metric conversion.  The

No. 08-51260

government attempted to introduce the lab report into evidence through Adams, but the court ordered that the drug quantity be redacted, based on its determination that Yates had not actually weighed the marihuana. If that were the only evidence, Jose's argument might be sound.

But that is not the case. Amaro testified that he searched the RV and found approximately 387.10 pounds of marihuana. Although Jose now says that Amaro was not involved in weighing the drugs and therefore had no basis for knowing the weight, he raised no objection when the testimony was elicited. When cross-examined, Amaro admitted that someone else had weighed the marihuana. Defense counsel did not, however, ask questions that established that Amaro had no basis for knowing the quantity, and counsel did not make a hearsay objection.

Amaro's unrefuted testimony establishes that the offense involved 387.10 pounds, or 175.6 kilograms, of marihuana. Even if that information were hearsay, where "'there is no objection to hearsay the jury may consider it for whatever value it may have.'" *United States v. Hamilton*, 694 F.2d 398, 401 (5th Cir. 1982) (quoting *United States v. Pearson*, 508 F.2d 595, 596 (5th Cir. 1975)). And, because evidence is to be viewed in the light most favorable to the verdict, *see DeLeon*, 247 F.3d at 596, Amaro's testimony is sufficient to support the jury's determination that the offense involved more than 100 kilograms of marihuana.[1]

---

[1] This is especially true given that the testimony was bolstered by other government evidence tending to show that the amount of marihuana exceeded 100kg. For instance, Yates testified that "190 bundles" of marihuana were seized, and the government introduced a photograph showing bundles of the seized marihuana (along with a sign stating that the marihuana weighs 387.10 pounds). Although Yates did not testify as to the weight of each bundle, her testimony, in tandem with the photograph, leads to the conclusion that a large amount of marihuana was involved. Although those pieces of evidence alone might not have been sufficient for the government to meet its burden, they helped to confirm Amaro's testimony.

7

No. 08-51260

B.

Jose argues that the district court erred by allowing the government to introduce extrinsic evidence of his 1992 conviction of distribution of cocaine. He contends that that offense should not have been admitted, because it was too remote in time and was a different type of crime.

The prior conviction was extrinsic evidence and therefore implicates Federal Rule of Evidence 404(b). *See United States v. Crawley*, 533 F.3d 349, 353-54 (5th Cir.), *cert. denied*, 129 S. Ct. 522 (2008). We review a decision to admit evidence of prior convictions for abuse of discretion, subject to a harmless-error inquiry. *See United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007). The abuse-of-discretion standard is heightened where evidence is admitted under rule 404(b), because "[e]vidence in criminal trials must be strictly relevant to the particular offense charged." *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003) (citation and internal quotation marks omitted).

The district court determined that by pleading not guilty, Jose placed at issue his intent to distribute drugs, so proof of the 1992 conviction was relevant as probative of his state of mind. The court also decided that the probative value of the evidence outweighed any prejudice. The government introduced the prior conviction by calling a sheriff's deputy, who testified that he had arrested Jose in 1992 for delivery of a controlled substance. The court gave a limiting instruction when the testimony was elicited and included the same in the final jury instructions.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b). Evidence of other crimes, wrongs, or acts, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* To be admissible, extrinsic offense evidence must be "relevant to

8

No. 08-51260

an issue other than the defendant's character." *Crawley*, 533 F.3d at 354; *see United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

The standard used in the relevancy inquiry is whether the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Beechum*, 582 F.2d at 911 (quoting FED. R. EVID. 401). The evidence must possess "probative value that is not substantially outweighed by its undue prejudice." *Crawley*, 533 F.3d at 354 (quoting FED. R. EVID. 403). The balancing of probative value and unfair prejudice requires "a commonsense assessment of all the circumstances surrounding the extrinsic offense." *Beechum*, 582 F.2d at 914. And "[t]he probative value of the evidence, the [g]overnment's need for the evidence on the issue of intent, and the court's limiting instructions are all relevant." *United States v. Booker*, 334 F.3d 406, 411 (5th Cir. 2003).

As the district court observed, Jose pleaded not guilty, so intent and knowledge, two permissible purposes in rule 404(b), became issues at trial.[2] Moreover, "the amount of time that has passed since the previous conviction is not determinative." *Arnold*, 467 F.3d at 885. Jose's conviction for the extrinsic offense occurred 16 years before trial. In *Arnold*, *id.,* we observed that we had upheld the admission of rule 404(b) evidence where the time period was as much as 15 and 18 years before the charged offense. The extrinsic offense and the charged offense do not have to be identical for the extrinsic offense to be relevant. *See Beechum*, 582 F.2d at 913. In *United States v. Chavez*, 119 F.3d 342, 347-48 (5th Cir. 1997), we affirmed the use of a prior conviction for distribution of cocaine as rule 404(b) evidence where the conviction at issue was conspiracy to possess marihuana.

---

[2] *See Arnold*, 467 F.3d at 885; *see also United States v. Pando Franco*, 503 F.3d 389, 394 (5th Cir. 2007) (reasoning that the offense of aiding and abetting requires, inter alia, a showing of guilty knowledge and purposeful participation), *cert. denied*, 128 S. Ct. 1874 (2008).

No. 08-51260

Evidence is relevant where it alters the probabilities of a consequential fact. Here, intent and knowledge were at issue. *See Pando Franco*, 503 F.3d at 394. And intent and knowledge were also at issue in Jose's prior conviction. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (Vernon 1992); *Cooks v. State*, No. 05-92-00318-CR, 1993 WL 164988, at *1 (Tex. App.––Dallas 1993, no writ). The extrinsic offense is thus relevant to intent and knowledge, because it lessens the likelihood that Jose committed the charged offense with innocent intent or lack of knowledge. *Cf. Beechum*, 582 F.2d at 913.

Because Jose claimed that he had no knowledge that a drug transaction was taking place, his prior conviction for drug distribution was also *probative* of the fact that he had the requisite intent and knowledge to participate in a drug trafficking operation. *See Booker*, 334 F.3d at 411; *Beechum*, 582 F.2d at 916. Furthermore, the extrinsic offense was not of such a "heinous nature" that it would "incite the jury to irrational decision by its force on human emotion." *Beechum*, 582 F.2d at 917. The district court minimized the danger of unfair prejudice by instructing the jury regarding the limited purposes for which it could consider the evidence. *Cf. Booker*, 334 F.3d at 411. The court did not abuse its discretion.

C.

In a separate sufficiency-of-the-evidence argument, Jose urges that because he was not in the RV, did not have access to or control over it, and did not possess the marihuana, his conviction of aiding and abetting must be reversed. We disagree.

Jose was charged with violating § 841(a)(1) and 2. In a prosecution for possession with intent to distribute a controlled substance under § 841(a)(1), the government must prove beyond a reasonable doubt that the defendant knowingly possessed the substance with intent to distribute it. *United States v. Shabazz*,

10

No. 08-51260

993 F.2d 431, 441 (5th Cir. 1993). In a prosecution for aiding and abetting under § 2, however, the government need not prove that the defendant committed all elements of the substantive underlying offense if he aided and abetted each element. *United States v. Aguirre Aguirre*, 716 F.2d 293, 298 (5th Cir. 1983). Thus, Jose's assertions that he was not in the RV, had no control over the RV, and did not possess the marihuana are irrelevant.[3]

To prove aiding and abetting, the government had to establish that Jose "(1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed." *Pando Franco,* 503 F.3d at 394. Because Jose concedes that the evidence was sufficient to establish that he associated with the criminal venture and purposefully participated in the crime, the only question is whether the evidence establishes that he sought, by his actions, the success of the criminal venture.

The day before the offense, Jose met with Nadine, Portillo-Lopez, and Camacho-Orozco outside the Charleses' house, where they discussed a plan by which Portillo-Lopez would pick up a load of drugs in an RV and Jose would compensate him for doing so. Jose also discussed how Portillo-Lopez should follow him to the drugs, and he suggested that Portillo-Lopez bring a female passenger to dispel suspicion. Jose went with Nadine, Portillo-Lopez, and Camacho-Orozco to pick up the RV, which was at an RV park where Jose and Nadine had leased a parking space. Jose provided Portillo-Lopez with a cellular phone number so they could keep in touch.

Portillo-Lopez, who drove the RV, followed the Charleses' vehicle, with Jose, Nadine, and Camacho-Orozco in it, to Presidio. Portillo-Lopez telephoned them as they drove. They arrived in Presidio in the evening, and the four of

---

[3] *See, e.g.*, *United States v. Williams*, 985 F.2d 749, 753 (5th Cir. 1993) ("[A defendant] need not have actual or constructive possession of the drugs to be guilty of aiding and abetting possession with intent to distribute.").

them slept in the RV. The next day, they waited. Once Camacho-Orozco received a phone call, Portillo-Lopez and Camacho-Orozco drove west of Presidio, where the RV was loaded with marihuana. After Portillo-Lopez was stopped by the Border Patrol in Presidio, and as they were heading toward Marfa, Portillo-Lopez saw the Charleses' car pass him, also going eastbound. That testimony indicates that Jose and Nadine stayed in the Presidio area while the RV was loaded with marihuana.

Records of cellular phones used by Jose corroborate Portillo-Lopez's testimony––that Jose went to Presidio and stayed overnight––by indicating that Jose made numerous phone calls in the Presidio area the night before and day of the drug bust. Cellular phone records also establish that Jose and Portillo-Lopez exchanged several calls on those days. That testimony suggests that Jose was actively monitoring the progress of the drug transaction.

Jose provided inconsistent accounts of his involvement in the offense. For example, Lloyd testified that Jose confessed that he traveled to Presidio to smuggle marihuana with two other individuals and a female. When Jose testified, he stated that he had no knowledge that a drug transaction was taking place. Lloyd also testified that when he interviewed him, Jose stated that his wife did not accompany him on the trip. Indeed, Jose asserted repeatedly that Nadine did not accompany him. He subsequently admitted, however, that she went with him to Presidio. The jury was entitled to rely on such inconsistencies to find implausible Jose's denial of knowledge of the offense.[4] *See United States v. Casilla*, 20 F.3d 600, 607 (5th Cir. 1994).

Given all that evidence, it was not irrational for the jury to conclude that Jose aided and abetted the possession with intent to distribute marihuana. *See*

---

[4] And there is even more: for instance, his 1992 conviction for delivery of a controlled substance—useful to show knowledge and intent—and the drug trade paraphernalia and small quantities of cocaine and marihuana that were found at the Charleses' house.

No. 08-51260

*United States v. Lopez-Urbina*, 434 F.3d 750, 757 (5th Cir. 2005).  The evidence is sufficient to support the conviction.

## III.

Nadine claims (1) that the evidence is insufficient to support her conviction, (2) that the district court erred by not allowing a witness's prior conviction to come in for impeachment, and (3) that drug ledgers were hearsay and should not have been admitted.  We address each contention in turn.

## A.

Unlike Jose, Nadine does not argue that there was insufficient evidence of drug quantity.  Rather, she asserts generally that the evidence was insufficient to convict her.

Much of the evidence that supports Jose's conviction also supports Nadine's.  Nadine "associated with the criminal venture," *Pando Franco*, 503 F.3d at 394, when she participated in the organizational meeting with Jose, Portillo-Lopez, and Camacho-Orozco about acquiring marihuana in Presidio.  She sought by her actions for the venture to succeed, *see id.*, when she leased a space in the RV Park.  She "purposefully participated in the crime," *id.*, when, after the organizational meeting, she went with Portillo-Lopez to the RV, then traveled to Presidio when she knew that the purpose of the trip was to pick up marihuana.[5]  And, finally, other evidence, such as her recent arrest for marihuana smuggling and the seizure of drug trade paraphernalia from the Charleses' house, indicates

_____

[5] Although Nadine originally told officials that she had never been to Presidio, and Jose had corroborated that statement, Jose subsequently recanted, stating that Nadine had in fact accompanied him to Presidio.  The jury was free to consider Nadine's statement that she had not been to Presidio, which was inconsistent with the testimony of her husband and Portillo-Lopez, as inherently suspicious and masking an underlying consciousness of guilt. *See United States v. Diaz-Carreon,* 915 F.2d 951, 955 (5th Cir. 1990).

that Nadine was not just a mere spectator but had the requisite knowledge and intent to make the venture succeed. *See Pando Franco*, 503 F.3d at 394. Given all this, it was rational for the jury to conclude that Nadine aided and abetted the possession with intent to distribute marihuana. *Cf. Lopez-Urbina*, 434 F.3d at 757.

B.

Nadine claims that the district court erred by not allowing her to impeach the credibility of Portillo-Lopez with a prior conviction. Federal Rule of Evidence 609 allows impeachment of a witness other than an accused by evidence of conviction of a crime that was punishable by death or imprisonment in excess of one year and the court determines that the probative value of admitting the evidence outweighs its prejudicial effect. FED. R. EVID. 609(a)(1). "[E]vidence that any witness has been convicted of a crime shall be admitted regardless of the punishment, if it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness." FED. R. EVID. 609(a)(2).

Rule 609(b) imposes what essentially amounts to a time limit: "[T]he probative value of a conviction over ten years old is outweighed by its prejudicial effect." *United States v. Estes*, 994 F.2d 147, 149 (5th Cir. 1993). "The general rule is inadmissibility." *Id*. The legislative history of rule 609(b) "makes clear that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances." *United States v. Cathey*, 591 F.2d 268, 275 (5th Cir. 1979) (citation and internal quotation marks omitted). "Congress intended that trial judges be extremely cautious in admitting evidence of remote convictions." *Id*. (internal citation omitted). The standard of review governing evidentiary rulings under rule 609(b) is abuse of discretion. *Id*. at 274 n.11.

The government argued that Portillo-Lopez had numerous prior convic-

tions and that all of them had occurred, and the prison terms had been served, more than ten years earlier. According to the government's recitation of Portillo-Lopez's criminal history, his prior convictions included an aggravated robbery conviction that took place in 1981 for which he received a term of probation. Although Nadine does not discuss the date of the robbery conviction that she challenges on appeal, because the discussion in the trial court mentions only the 1981 robbery conviction, and the trial was in 2008, it appears that she is arguing that the district court abused its discretion by refusing to allow evidence of a 27-year-old conviction.

Nadine's contention is premised on incorrect interpretations of rule 609 and cases construing it. First, she asserts that an "old" conviction is admissible if it can be "readily determined" that the offense elements involved dishonesty or a false statement. The "readily can be determined" language, however, is not an exception to the ten-year limit of rule 609(b). Rather, that language is in rule 609(a)(2), which merely indicates that such crimes are admissible regardless of the punishment that was imposed. *See* Rule 609(a)(1), (2). Rule 609(b)'s ten-year limit applies as a separate test of all convictions, even ones where "it readily can be determined that establishing the elements of the crime required proof or admission of an act of dishonesty or false statement by the witness." Rule 609(a)(2).

Second, Nadine argues that "if a conviction is over ten years old then there must be a determination by the court whether the probative value is outweighed by the prejudicial effect." That is incorrect. The interest-of-justice determination set forth in rule 609(b), which is made by weighing the probative value of the evidence against its prejudicial effect, is necessary only where a district court chooses to admit evidence of a prior conviction that is more than ten years old. *See Estes*, 994 F.2d at 149; *United States v. Avants*, 367 F.3d 433, 448 (5th Cir. 2004). A court thus need not perform the balancing test where it decides to ex-

No. 08-51260

clude evidence of a conviction that is more than ten years old.[6]

Finally, Nadine's conclusory assertion that robbery involves a crime of moral turpitude does not challenge the district court's rationale for excluding the evidence. And she fails to give any explanation of how "the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." *See* Rule 609(b). The district court did not abuse its discretion.

C.

Nadine contends that the district court erred in overruling her hearsay objection to notebooks that the government introduced.[7] We reject her contention.

District courts have broad discretion to admit or exclude evidence, if somewhat less so in criminal cases. There, we "review[] evidentiary rulings on a heightened abuse of discretion basis." *United States v. Franklin*, 561 F.3d 398, 404 (5th Cir.), *cert. denied*, 129 S. Ct. 2848 (2009). A hearsay challenge involves non-constitutional error, which is "harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (citation and internal quotation marks omitted).

Officer Koontz testified that in the office of the Charleses' residence he found notebooks along with drug trade paraphernalia. He testified that drug traffickers use such notebooks and ledgers to keep track of amounts payable and

---

[6] In any event, the record shows that the court *did* perform a rule 609(b) balancing test after considering the defense's argument that the robbery offense was indicative of deceit. The court determined that the conviction, which took place "back in the '80s," had "little relevance as to whether or not the Defendant is telling the truth now."

[7] Nadine does not contend on appeal that the notebooks lacked proper foundation or authentication. The record shows that she made those additional objections at trial, but her brief focuses solely on hearsay.

expenses for picking up narcotics.[8] Yates later provided testimony regarding a couple of entries in the notebooks. Nadine objected to the admission of the note-books, in part, on the basis that they contained hearsay.[9]

Her first claim is that the district court did not rule on the hearsay portion of her objection. The record belies that claim. Although the district court initial-ly stated only that it found the proffered evidence "relevant," it soon clarified that it was overruling the hearsay objection as well.

As for the substance of her hearsay argument, Nadine claims that before admitting the notebooks, the government had to establish that the declarant was unavailable and that the statement was reliable. That argument, however, mis-understands what is hearsay. Not every statement made outside the courtroom is hearsay. Aside from the various exceptions and exemptions, hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*." FED. R. EVID. 801(c) (emphasis added). The notebooks are not hearsay if not offered to prove the truth of their contents.

The government's experts testified that the notebook entries were common to drug ring operations. That evidence did not depend on whether any of the particular entries were true. That is to say, it did not matter if what, according to the witnesses' expertise, appeared to be standard entries listing quantities of drugs and the prices for which they were sold were actually sold or sold in that actual quantity or for that actual price. Rather, it was the existence of the en-tries that had significance, independent of their veracity. In this sense, the note-books were not statements subject to the hearsay rule, but rather "tools of the

---

[8] The notebooks contained numerous entries containing a name, a number, a pound sign, and what is most likely a dollar amount. For example, "Ernie 2# paid 800" and "Fat Ass 20# 6,500, 10# 3,250 . . . paid bal. 3250.00."

[9] Nadine objected later, as well, during Yates's testimony.

trade."[10]  "Their significance was the fact that they existed, not the details of what they showed." *United States v. Nava-Salazar*, 30 F.3d 788, 798 (7th Cir. 1994).

Nadine points out, however, that the government did not merely admit the notebooks into evidence.  During her testimony, Yates referenced particular contents of the notebooks on at least two occasions: once by reading an entry about the rental of an RV space and again by reading an entry stating that money had been given to "El Cheapo,"[11] which Portillo-Lopez had testified was Camacho-Orozco's nickname.  We need not address this contention, because any error in reading those particular entries from the admitted notebooks into the record was harmless beyond a reasonable doubt.

Even without the specific notebook entries, the jury had Portillo-Lopez's testimony linking her to the meeting at which the plan to acquire the marihuana was hatched, to preparations for the deal in the form of renting the RV, and to the trip itself.  The jury also had the statement of her husband, Jose, that Nadine accompanied him to Presidio––this after he denied the same multiple times.  And the jury had evidence of Nadine's recent drug arrest, which tended to show knowledge and intent.  All of that was in addition to the various pieces of physical evidence from the Charleses' residence, the admission of which Nadine does not challenge, and the notebooks themselves to the extent that they were admitted as "tools of the trade" rather than to prove the truth of their contents.

AFFIRMED.

---

[10] *See, e.g.*, *United States v. Gonzales*, 307 F.3d 906, 909-10 (9th Cir. 2002) (holding that pay/owe sheets are not hearsay, because they are tools of the trade and not offered to prove the truth of their contents); *cf. United States v. Martinez*, 808 F.2d 1050, 1057 (5th Cir. 1987) (noting that firearms are "tools of the trade" of those engaged in illegal drug activities).

[11] Pronounced "El Cheapo" but recorded in the notebooks as "El Chipo."